---

HULERY (CLINE v.). See Case No. 2,897.

HULINGS (ROACH v.). See Case No. 11,-874.

---

## Case No. 6,856.

### Ex parte HULL et al.

[1 N. Y. Leg. Obs. 1; 5 Law Rep. 319.]

District Court, S. D. New York. Aug., 1842.

BANKRUPTCY — OPERATION OF BANKRUPT ACT — RETROSPECTIVE LAWS—INSOLVENCY.

1. A debt contracted prior to the passing of the bankrupt act is within its operation, and will support an adverse decree in bankruptcy.

2. The word "insolvency," in the 14th section of the act [of 1841 (5 Stat. 448)], as applied to voluntary applications for a decree, means inability to meet engagements; but in relation to compulsory proceedings by creditors, it means the bankruptcy of the debtor as known to the court as a ground for proceedings, and must be proved in the manner indicated by the first section of the statute.

This was an application by John W. Hull and Abraham H. Smith to show cause against being declared bankrupts. It appeared by the petition of the creditors: That previous to December last, Hull and Smith were merchants and partners in trade in the city of New York. That in the months of August, September, October and November last, they purchased of the petitioner, or other mercantile firms in New York, large quantities of merchandise, exceeding in value $40,000, and that, in the early part of December last, they failed in business and declared themselves insolvent, leaving the whole of the said debt of $40,000 unpaid. The petitioners alleged various acts of fraud, and among other things, that in the month of December last, Hull departed from the state of New York, with intent to defraud his creditors and to prevent his being arrested, and that he still continued from the state, and concealed himself in some place unknown to the petitioner; and that Smith, since the departure of Hull, and within a short time past, had declared that the firm of Hull & Smith was utterly insolvent and able to pay but a very small part of their just debts. It appeared to be conceded on the argument, that enough was shown in this matter to support the proceedings as against Hull, because of his continued concealment to avoid being arrested. The questions raised for the consideration of the court were: 1st. Whether the acts of fraudulent bankruptcy, committed anterior to the passage of the act, could be brought within its operation and redress. 2d. Whether, in the case of partners, a mere insolvency of the firm will enable creditors to sue out a decree.

A. S. Johnson, for bankrupt.

Salem Dutcher, for creditors.

BETTS, District Judge. Statutes of a penal character will not be construed to have a retrospect beyond the time of their commencement (Bac. Abr. "Statutes," C; 7 Johns. 477; Dwar. St. 680); such retrospect is the acting of the law by its own vigor to change the interests or rights of parties, because of some fact or circumstance existing before the law was passed, so as to divert or diminish an interest then subsisting, or to render an act criminal which was not interdicted at the time it was committed. A distinction, however, has been taken between laws which operate directly to abrogate vested rights, and those which annul or vary the remedies existing when the right accrued for its maintenance or enforcement. [Sturges v. Crowninshield] 4 Wheat. [17 U. S.] 122; [Mason v. Haile] 12 Wheat. [25 U. S.] 370; 2 Kent, Comm. 462. Such laws supply the rule governing courts in administering remedies in all cases pursued before them, without regard to the nature of the remedy authorized antecedently, and at the time the right in suit was created or perfected. [Bank of U. S. v. Halstead] 10 Wheat. [23 U. S.] 51; [Beers v. Haughton] 9 Pet. [34 U. S.] 329. The principle upon which this distinction rests, is of familiar and constant application, although to practical purposes the remedy often becomes the all essential qual-

ity of the right. [Wayman v. Southard] 10 Wheat. [23 U. S.] 1; [Bank of U. S. v. Halstead] Id. 51; Beers v. Haughton [supra]; Lehoy v. Crowninshield [Case No. 8,269]; [Suydam v. Broadnax] 14 Pet. [39 U. S.] 67.

Notwithstanding the commingling of right and remedy, as to every purpose of useful enjoyment, the law has always marked a broad distinction between statutes having relation to the one or the other; those touching the remedy being mandatory to the courts only, and governing their proceedings; whilst those affecting right of persons or property attach to individuals, and the rights, once having acquired existence, cannot be abrogated or changed by posterior enactments, particularly under an equitable interpretation of the constitution of the United States. This distinction is frequently presented and acted on. A penalty or forfeiture arising under a statute cannot be recovered after the statute is repealed. [The Rachel v. U. S.] 6 Cranch [10 U. S.] 329. So also statutes of limitation take away the remedy (5 Dane, Abr. 392), and operate upon matters in litigation alike where the right of action existed previous to the enactment of the law as when it accrues subsequently (U. S. v. Gooding, 12 Wheat. [25 U. S.] 478; [Wilkinson v. Leland] 2 Pet. [27 U. S.] 627, 660; [Satterlee v. Matthewson] Id. 413; [Charles River Bridge v. Warren Bridge] 11 Pet. [36 U. S.] 509; [Watson v. Mercer] 8 Pet. [33 U. S.] 110; [Suydam v. Broadnax] 14 Pet. [39 U. S.] 74).

Whatever may be the difficulty as to the exercise of legislative powers over vested rights in prohibiting their enforcement, or introducing new limitations or bars to them, it seems the opinion of our most distinguished tribunals, that under our government the legislative authority is paramount, and may prescribe the rule of judging to the judiciary only in the excepted case of a constitutional interdiction, which would check or supersede the action of the legislature. Suydam v. Broadnax [supra].

The subject has been largely discussed in the state courts and those of the United States (1 Kent, Comm. 455; 3 Story, Const. Law, 266); and an attentive perusal of the opinions of the judges, and the qualifications with which they are announced, I think, will show, that in every case where a retrospective action has been denied to a statute, it has been upon the ground that the act itself has not distinctly and clearly assumed that power (1 Kent, Comm. 455, 456, and notes). Here, and in England, the plain and positive terms of a statute must be executed, if within the competency of the legislative power, without regard to its consonance with reason, justice, or the natural rights of individuals. 1 Gill. 158; [The Hoppet v. U. S.] 7 Cranch [11 U. S.] 389. These remarks apply to laws of a general bearing affecting the rights of parties, and have still greater force, as has been already intimated, in respect to enactments touching the practice of the courts, and the

privileges of suitors therein, to retain the like remedy for rights as were in force when the rights accrued.

It would seem, therefore, then singly with the exception of laws ex parte facto, that the courts of this country and England claim no authority to intercept the execution of the legislative will affecting by its laws a past condition of things when the legislative intention so to do is manifest; they only refrain from construing a law so as to give it a retrospective operation when its provisions may be otherwise satisfied. Upon this doctrine I can see nothing in the way of applying the provisions of the bankrupt act to the particulars antecedent to its passage, if its language denotes the intention of congress to give it such operation. Clearly this is so in respect to the effect of a discharge, for the bankrupt is exonerated alike from debts due at the passage of the law, with those subsequently incurred, or not yet due (sections 4, 5), and the benefit of a discharge is withheld, when a preference has been given by a bankrupt to creditors after the first of January, 1841, or at any other time, in contemplation of the passage of a bankrupt law, although it is believed that by the laws of all the states such preferences were lawful anterior to the passage of this act. In another particular, the act clearly retrospects, in giving the courts cognizance of cases of voluntary bankruptcy, because it embraces all persons owing debts at the time of its enactment, which shall not have been created in a particular manner; necessarily excluding the idea that debts must be created subsequently to the passage of the act to come within its operation.

A reference to contemporaneous history would fortify this reading of the act, for it was made a prominent incident to the policy of this law, that it should apply relief to that oppressive condition of indebtedness then weighing upon the community. Taking it to be undeniable, that congress intended the act should apply to debts contracted previous to its passage when the proceedings are voluntary on the part of the bankrupt, the argument must be a most difficult one to establish any sound discrimination that excludes cases of involuntary bankruptcies from a like operation and construction of the act. The involuntary proceedings are applied at once on the enactment of the statute to the classes of persons designated, owing debts at the time, and though there might be grievous injustice in treating past acts of the debtor in the creation of the debts, or disposition of his property, as grounds for punishment, or privation of any rights by force of the posterior law, still such past acts may, with greatly less incongruity, be called for to show the quality of the indebtedness, and to found thereupon such relief as equity may interpose in behalf of creditors.

This view of the case need not be pursued, because whatever decision the court

might adopt on the naked question, whether the bankrupt act does or can retroact so as to affect interests legally existing at its enactment, the point now presented requires no more of the court than to pronounce whether the proceedings by creditors against a bankrupt to obtain a decree of bankruptcy, and the distribution of his effects, is necessarily an interference with vested rights of such debtor in respect to person or estate. If it is not anything more than a remedy supplied to creditors for the collection of their debts against evasive or fraudulent debtors, the only further inquiry would be whether such remedy does not necessarily embrace any indebtedness in existence at the time it is put in force. The bankruptcy of a debtor is nothing else than his inability or refusal to pay his debts. The legislation of various periods and governments has attached to this condition of the debtors, provisions intended to protect creditors sometime operating upon the person of the debtor, and at others upon his estate, with an energy and promptitude varied according to the character of the government or people, or disposition of the times. Cleared of the features which render fraudulent bankruptcy a crime, bankruptcy laws in principle and operation are no more than an instrumentality for the collection of debts with vigor and celerity. They are based upon the plain equity that the estate and means of a debtor ought not to be enjoyed by him and his creditors be left unsatisfied, and they supply the creditors ready means to compel an unwilling debtor to do what in justice he ought to do towards them: this is their eminent characteristic; they wrest from the possession of the bankrupt his estate, and place it under the control of some tribunal charged with its proper disposition. The spirit of this proceeding has always been familiar to our laws and usages, in case the debtor could not be found personally, so that the powers of the court could act on him individually to secure the rights of his creditors. The process is as efficacious and summary in case of an absent or concealed debtor as in bankruptcy, and no sound reason is discerned for regarding the absence or presence of the debtor, a controlling consideration in providing a remedy for his creditors against his estate. In many states an attachment of a debtor's estate is the first process granted a creditor, and it places at once his property under the control of the law without demanding a previous judicial ascertainment of the right of the creditor.

The enlarged remedy now supplied in chancery by creditors' bills covers as wide a field of relief and by a procedure as cogent and searching in relation to the debtor as that given by the bankrupt act, and a process still more summary and efficacious is secured the government by the act of March 3, 1797 [1 Stat. 512], to recover its balances against receivers of public moneys. There would be no anomaly in principle, therefore, in regarding the bankrupt act, in so far as the arrest and distribution of a debtor's effects are concerned, of no higher claim or force than an attachment procedure constructed to secure an equal participation by all creditors in a failing debtor's estate, and in that point of view it would be wholly immaterial whether the facts upon which the remedy acts, come into existence before or after the passage of the statute. The relief on a creditor's bill is administered in chancery on this principle, for not only debts accrued antecedent to the act of 1830 (2 Rev. St. p. 173, § 38), but judgments rendered before the passage of the act receive the aid of chancery without any language of the statute retroactive in terms. 4 Paige, 309.

The supreme court, in discussing the character and effect of bankrupt laws, intimates most significantly that an act may be a bankrupt law without containing any clause discharging the obligation of the debt,—[Sturges v. Crowninshield] 4 Wheat. [17 U. S.] 199,—and then it need be no more than a power to the court to proceed in a particular method on the proof of the insolvency of debtors, to put their property within reach of their creditors; in effect to substitute a summary sequestration on adequate notices and causes shown, for the ordinary processes of collection by suit at law. The earlier frame of the bankrupt laws in England made no provision for the discharge or release of the debt, or even of the person, their purpose being to give to the law the administration of an insolvent debtor's effects, so as to insure their entire and equitable appropriation to that object. Should our legislatures accordingly put the estates of insolvent debtors, living or deceased, upon the same footing, and arrange their laws so that a ratable distribution amongst creditors should be enforced alike in both cases, it could be regarded no more than a mere scheme of relief or practice, and would necessarily control the action of the court the moment it came in force.

I think, then, that upon the first point of the case, the petition is sustainable, and that the debtors, still being copartners, are liable to be decreed bankrupts for the fraudulent disposition or concealment of their partnership property, charged in this case. This remedy, it is to be further remarked, does not reach to the consequences attending bankruptcy in England, for no person who fairly received the property of these debtors, after their acts of bankruptcy, can be called in question for it under these proceedings. The remedy acts exclusively upon the debtors, and the estate remaining in their right at the time of the decree.

With a view to the ulterior relief of parties in respect to this decree, it is proper also to dispose of the other point involved in the objections, although a decision upon

it, the one way or the other, would not vary the result in this case; that is, whether the debtors, as insolvent parties, are subject to this proceeding without other proof of bankruptcy than their inability to pay their debts. A decision made by the district court of Tennessee—Ex parte Galbraith [Case No. 5,187]—on this point in the affirmative of the question is cited and relied upon by the counsel for the petitioners as a judicial construction of the act, independent of what is claimed to be the obvious and direct language of the statute itself. The 14th section provides, that where "two or more persons who are partners in trade become insolvent, an order may be made in the manner prescribed in this act either on the petition of such partners or any one of them, or on the petition of any creditor of the partners," &c.

A new rule it is supposed is here introduced in respect to copartners, and that a mere insolvency or inability to pay their debts induces all the consequences of bankruptcy. In a general sense and to all practical ends in business transactions, there is no sound distinction between bankruptcy and insolvency. It is believed that the terms are used convertibly in ordinary parlance; they are so historically. Montifiore, Com. Dict. voce "Bankrupt"; M'Culloch, Dict. (Last Ed.) Id. Legal compilers recognize the same common import of the words in the law. Petersd. Abr. Id. And our highest tribunals, called upon to collate and discriminate the one from the other, admit there is no principle even in a statute applicable to either condition of debtors, which marks with exactness when it is an insolvent law and when it becomes a bankrupt law. [Sturges v. Crowninshield] 4 Wheat. [17 U. S.] 122; [Ogden v. Saunders] 12 Wheat. [25 U. S.] 273. The difference lies essentially in the scheme of remedies adopted in reference to bankruptcy or insolvency, to effectuate which the law arbitrarily pronounces a man bankrupt upon the commission of particular acts, though he be indisputably solvent. Doug. 92, note. The same course also is sometimes applied to insolvents, as our revenue laws declare a debtor on customhouse bonds insolvent on the assignment of his property, or its attachment on the commission by him of an act of bankruptcy—Act March 2, 1799, § 65 [1 Stat. 675]—irrespective of the sufficiency of the assigned or attached property to satisfy all his debts, and nothing but the statutory proof is regarded as evidence of the fact. [Reily v. Lamar] 2 Cranch [6 U. S.] 356; [U. S. v. Hooe] 3 Cranch [7 U. S.] 73; [Prince v. Bartlett] 8 Cranch [12 U. S.] 431; [Thelusson v. Smith] 2 Wheat. [15 U. S.] 396.

It is manifest that congress, adopting these principles in defining and classing cases that fall within the bankrupt act, has legislated with a view to an assumed or artificial state of insolvency or bankruptcy in debtors, and not upon the actual circumstances of such debtors, because the proceedings are carefully made to depend on certain specified evidence or proofs of bankruptcy, and no provision is made to arrest them on any degree of proof showing the ability and readiness of the party to discharge all his debts. The first section evinces the clear purpose of congress in this respect, and points out, with precision and exactness, the cases coming within the cognizance of the court under the act. The jurisdiction of the court does not attach on the petition of a party himself or that of his creditors, however clearly his insolvency may be established, unless the very evidence specified by the statute is supplied. Indeed, the court has no authority to institute or entertain an inquiry into the fact of insolvency, for it is compelled to declare a petitioner bankrupt on his own sworn representation of his inability to pay his debts, or on that of his creditors if he has done any act indicated by the statutes, and owes $2,000, whatever may be his real wealth and responsibility. It would not be probable that congress, after this minute and specific legislation on insolvency and bankruptcy, should intend in a subsequent clause to discard the entire principle on which the jurisdiction of the courts over them was made to rest, and establish, by the 14th section, a substantive scheme of bankruptcy upon an untried and unheard of principle. For it must be borne in mind, that if mere insolvency subjects copartners to a commission of bankruptcy, the state and responsibility of every trading firm may be made the subject of judicial investigation at the instance of any creditor who may allege that it is unable to pay its debts.

But aside of the general considerations opposed to giving such operation to the 14th section, and the incongruity with other provisions of the act, does the language of that section demand or authorize such construction? I think not. Although partners in trade who become insolvent may be proceeded against as bankrupts, yet the order must be made in the manner provided in the act, and that qualification would be repugnant to the notion that mere insolvency supplied grounds for the decree, it being already shown that the pervading principle of the act requires the order in case of compulsory bankruptcy to be made without regard to the fact of solvency, and on the proof of other and distinct facts from that of insolvency. This clause would seem to have been introduced to mark that procedures against partners are to be the same as against individuals; and to carry out such intent the insolvency referred to in the 14th section must be identical with that defined in the first, and it denotes that congress contemplated in this provision insolvency to be synonymous with bankruptcy. The purpose of congress in this behalf is not left wholly to inference and presump-

tion, for in the last clause of the section, after designating the course of procedure in respect to joint and separate estates and liabilities of co-partners, and making various specific provisions on those topics, it is declared that in all other respects the proceedings against partners shall be conducted in like manner as if they had been commenced and prosecuted against one person alone. Not merely prosecuted, leaving ground for an intendment that the foundation of the proceedings might be dissimilar, but in respect to partners they are to be carried out in every particular not distinctly named in the sentence, as if commenced and prosecuted against an individual.

The section, thus taken together, indicates the purpose of congress with sufficient clearness. The act had established the principles upon which the bankruptcy of individuals should be decreed, and the method by which the proceedings should be conducted from the commencement of the termination. These provisions would conformably to the uniform practice under the English bankrupt laws, have supported a joint commission against all the members of a copartnership, on acts of bankruptcy committed by all, or a separate commission against each party as an individual bankrupt. Cullen, 451. But the court there had been sometimes embarrassed with the distribution of the estates of the individual parties under the general commission, and also with the question, whether a joint commission against the partnership, and a separate one against the individual parties, could be maintained at the same time. The decisions of the chancellor had overcome the difficulties in a good degree, and probably all impediments resulting from that double relationship of the bankrupt were removed by the later English statutes. Cullen, 451; 2 Eden, 60.

With a view undoubtedly to free our system from all uncertainties on this subject, congress embodied in the 14th section, and established by express enactment, the rules upon which the law is now administered in this behalf in England,—Eden, 60; Com. Dig. (by Hammond) 7, art. "Bankrupt,"—the leading purpose of the section being manifestly to provide for the application of the law on a joint commission, to the compound relationship of the bankrupt in his individual and copartnership indebtedness.

The circuit court of this district at the last term, decided that the evident general intent of the section must give interpretation to peculiarities of phraseology, so as to render all parts of the section consonant with such intent, and that accordingly a decree of bankruptcy upon the petition of one partner in his own behalf, and as a member of a firm, alleging his own bankruptcy, would not pass the partnership effects to his assignee. Case of Paulson.

In my judgment, therefore, the insolvency spoken of in the 14th section, is in case of voluntary petition by the debtor, the inability to meet his debts and engagements referred to in the first and must be made known and established before the court in precisely the same manner: and in relation to compulsory proceedings by creditors, it is the bankruptcy of the debtor, known to the court as a ground for these proceedings only when proved in the manner indicated by the first section. This reading of the 14th section brings it into harmony with other parts of the act, and comports also with the course of legislation of congress on kindred subjects. Besides, if the 14th section is to be understood as introducing a rule peculiar to copartners, its operation would be to supersede the provisions of the first section so far as relates to that class of debtors, and accordingly a decree of bankruptcy could not be obtained against them on the commission of every act of fraud specified by that section, unless their actual insolvency could also be established. This would defeat in a great measure the principal object of the statute, which is to protect creditors against contrivances by debtors to avoid an equal distribution of their effects. Traders are parties most liable to sudden and heavy indebtedness, and would be those most apt to attempt to favor and secure portions of their creditors to the sacrifice of others. Mercantile business in this country is almost entirely conducted by copartnerships, and if those clauses of this statute, supposed by many to be the only legitimate provisions indicating a bankrupt law, are withdrawn from partnership dealers and merchants, and limited to individual debtors, the statute would be to a great degree a dead letter; essentially so in the particulars where its searching and summary energies are most urgently called for.

The conclusion to which I am led in the consideration of this case differs from the construction given the act by the district court of Tennessee. Ex parte Galbraith [Case No. 5,187]. It is to be deeply regretted that varying views should be entertained by courts in different parts of the Union, each of which is called upon to interpret and enforce the statute, and all of them being clothed with co-ordinate powers. This result must, however, occasionally occur from the nature of things. The courts have no consultation or interchange of opinions with each other, but each judge forms and declares the opinion to which his mind is led by his individual investigations and reflections. These opinions too are sometimes formed upon aspects of subjects calculated to produce exceedingly differing views. The thoroughness and learning of the arguments considered by one court may not be addressed to another, and the rules of construction which govern one judge may have but slight influence in a particular case upon the opinions of another; and the circumstance of

each court acting exclusively by itself will necessarily tend, most of all others, to introduce discrepancies between the decisions of these numerous tribunals. It must be an occurrence familiar to the experience of judges, that sitting together and hearing the same arguments upon the same statement of the case, their impressions are frequently, in the first instance, exceedingly diverse; and it would be a most rare event for two or more to hear a point really debatable, well discussed at the bar, and yet form within their own minds exactly the same conclusions. It is only by free conference, by mutual study of the question, by explanations and reasonings, reiterated with each other, and cautiously reviewed with an earnest anxiety to arrive at the correct result, that a common opinion can ordinarily be attained between men of equal intelligence, and examining the same subject from one point of view, and with advantages common to all. In the thirty district courts of the United States, officiating under circumstances of extraordinary diversity in respect to each other, the chances of opposing judgments upon the same questions must almost equal in number the points to be decided. And it certainly argues creditably for the perspicuity and precision of our statute laws, that they can be administered in so many tribunals, over a country so wide in extent, with practically so few and unimportant collisions in their construction.

Considering these debtors as continuing indebted and partners up to the time the petition was filed, I shall hold that their mere insolvency, without evidence of fraudulent acts, would not be sufficient to sustain the proceedings; but that they are liable to be decreed bankrupts upon the acts of fraud committed by their partnership, anterior to the passage of the bankrupt act, as set forth in the petition.