**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN THE MATTER OF: J. HOWARD
MARSHALL, III and ILENE O.
MARSHALL,

*Debtors*,

ELAINE T. MARSHALL, as Successor
Trustee of the BETTYE B. MARSHALL
Living Trust, Trustee of the J.
HOWARD MARSHALL, II Marital
Trust Number Two, and Trustee of
the E. PIERCE MARSHALL Family
Trust Created Under BETTYE B.
MARSHALL Living Trust Indenture
Dated October 30, 1990,

*Appellant*,

v.

J. HOWARD MARSHALL, III and
ILENE O. MARSHALL,

*Appellees*.

No. 09-55573

D.C. No.
8:03-cv-01354-
DOC

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
October 11, 2012—Pasadena, California

Filed June 28, 2013

Before: David M. Ebel,[*] Kim McLane Wardlaw, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

## SUMMARY[**]

### Bankruptcy

The panel affirmed the district court's affirmance of bankruptcy court decisions arising from the dispute over the estate of J. Howard Marshall, II, who left nearly all of his assets to his son, E. Pierce Marshall, but excluded his wife, Vickie Lynn Marshall, also known as Anna Nicole Smith, and his other son, J. Howard Marshall, III, from receiving any part of his fortune.

The panel held that non-random assignment of the Chapter 11 case of Howard III and his wife Ilene (Debtors) to Bankruptcy Judge Bufford, who presided over Vickie's Chapter 11 case, was within the court's discretion and in the interests of efficiency. The panel held that Judge Bufford did not abuse his discretion in denying the motion of Pierce's widow, Elaine T. Marshall, for recusal.

[*] The Honorable David M. Ebel, Senior Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

For the reasons outlined in the second amended opinion of the bankruptcy court filed on October 9, 2003, the panel concluded that the district court correctly affirmed the bankruptcy court's confirmation of the Debtors' Chapter 11 Plan and denial of Elaine's motion to dismiss with respect to the constitutional issues raised in the motion.

The panel held that the "Best Interests of Creditors" test in 11 U.S.C. § 1129(a)(7)(A) did not apply to Pierce or his Texas fraud judgment against Howard III, where Pierce never filed a proof of claim in the Debtors' Chapter 11 proceedings, and the deadline for doing so had passed by the time the bankruptcy court confirmed the Plan.

The panel held that the bankruptcy court's finding that the Debtors' Plan was proposed in good faith was not clearly erroneous, and that the confirmation of the Plan was not an abuse of discretion. The panel likewise held that the bankruptcy court's finding that the Debtors' Chapter 11 petition was filed in good faith was not clearly erroneous, and that the bankruptcy court did not abuse its discretion in denying Elaine's motion to dismiss.

---

**COUNSEL**

G. Eric Brunstad, Jr. (argued), Matthew Joseph Delude, and Collin O'Connor Udell, Dechert LLP, Hartford, Connecticut; Jeffrey W. Chambers, Ware, Snow, Fogel & Jackson, LLP, Houston, Texas, for Appellant.

David L. Neale (argued) and Michelle Sharoni Grimberg, Levene, Neale, Bender, Yoo & Brill LLP, Los Angeles, California; Anne Wells, Futter-Wells, PC, Santa Monica, California, for Appellees.

---

**OPINION**

NGUYEN, Circuit Judge:

This case marks the third time we have been asked to intervene in the infamous feud over the estate of the late Texas oil magnate and billionaire J. Howard Marshall, II ("J. Howard"). J. Howard died in 1995, leaving nearly all his assets to his son, E. Pierce Marshall ("Pierce"), but excluding his young wife, Vickie Lynn Marshall, also known as Anna Nicole Smith ("Vickie"), and his other son, J. Howard Marshall, III ("Howard"), from receiving any part of his fortune. The ensuing controversy, pitting wife against son and brothers against each other, has defied resolution for nearly two decades, and has survived almost all of its original players.

After J. Howard died, Vickie and Howard each unsuccessfully challenged his will in Texas probate court. In addition to losing the will contest, Howard suffered a multi-million dollar judgment after Pierce successfully counterclaimed against him on the basis of fraud. Following this loss, Howard and his wife, Ilene, filed for Chapter 11 bankruptcy in the Central District of California. Their case was assigned to United States Bankruptcy Judge Samuel

Bufford, who had previously presided over Vickie's Chapter 11 bankruptcy case.[1]

Pierce moved for random reassignment or recusal of Judge Bufford, objected to Howard and Ilene's proposed Chapter 11 Plan, and moved to dismiss the bankruptcy action. Judge Bufford published three separate opinions: (1) denying Pierce's motion for reassignment or recusal; (2) confirming the Plan and denying Pierce's motion to dismiss with respect to his constitutional arguments; and (3) confirming the Plan and denying Pierce's motion to dismiss with respect to his statutory arguments. Pierce appealed to the district court, which affirmed the bankruptcy court's decisions in all respects on March 18, 2009.

Appellant Elaine T. Marshall ("Elaine"),[2] Pierce's widow, now appeals the district court's decision, contending that the district court erred in affirming the bankruptcy court's orders because: (1) there was no basis for non-random assignment of the case to Judge Bufford, and alternatively, Judge Bufford should have recused himself on account of apparent bias; (2) Howard and Ilene's Chapter 11 petition and proposed Plan

---

[1] Vickie filed for bankruptcy protection in the Central District of California while her probate claims were still pending in the Texas court. Pierce filed a proof of claim, and Vickie successfully counterclaimed against him for tortious interference with an expectancy. Vickie's case was extensively litigated, including twice before the Supreme Court, and is not now before us. We nevertheless discuss certain aspects of her bankruptcy case to the extent they are relevant to this appeal.

[2] Pierce died in 2006. Elaine appears in her capacity as Successor Trustee of the Bettye B. Marshall Living Trust, Trustee of the J. Howard Marshall, II Marital Trust Number Two, and Successor Trustee of the E. Pierce Marshall Family Trust Created Under the Bettye B. Marshall Living Trust Indenture Dated October 30, 1990 (collectively "the Trusts").

were unconstitutional; and (3) Howard and Ilene's Chapter 11 petition and proposed Plan were filed in bad faith. We have jurisdiction pursuant to 28 U.S.C. § 158(d), and we affirm.

## BACKGROUND

## I.

## THE VICKIE LYNN MARSHALL CASE

In the Texas probate court, Vickie claimed that she was entitled to a portion of J. Howard's estate, and that Pierce had tortiously interfered with her expectancy of a gift from her husband. While the probate case was pending, she filed for bankruptcy in California, and the matter was assigned to Judge Bufford. Pierce filed a proof of claim, arguing that he held a defamation claim against Vickie that was not subject to her bankruptcy discharge. Vickie counterclaimed, contending, as she had in probate court, that Pierce tortiously interfered with her expectancy of a gift from J. Howard. Judge Bufford dismissed Pierce's proof of claim against Vickie, and proceeded to consider Vickie's counterclaim against Pierce. Over the course of the bankruptcy proceedings, Judge Bufford determined that Pierce had engaged in various discovery abuses and issued both monetary and non-monetary sanctions against him.[3]

In September 1998, Pierce moved to withdraw the case from bankruptcy court. District Judge William D. Keller

---

[3] Specifically, Judge Bufford found that Pierce (a) destroyed documents; (b) failed to respond to discovery requests; (c) failed to produce a privilege log and documents *in camera*; and (d) failed to produce documents held by J. Howard's attorneys.

withdrew the bankruptcy reference in part[4] in October 1998, after which Judge Bufford stated his intent to submit a memorandum to "assist [Judge Keller] in his review of the matter." On February 1, 1999, Judge Keller stayed Judge Bufford's prior sanctions orders. The next day, Judge Bufford declared the stay invalid and issued terminating sanctions against Pierce on Vickie's tortious interference counterclaim as a result of Pierce's purported discovery abuses. On March 9, 1999, Judge Keller vacated and remanded Judge Bufford's initial sanctions order, citing a lack of evidence. Then, after acknowledging receipt of Judge Bufford's memorandum, Judge Keller vacated his order withdrawing the bankruptcy reference.[5] On May 20, 1999, Judge Bufford entered a final sanctions order, once again deeming many of Vickie's allegations established as a sanction against Pierce.

Judge Bufford then held a five-day hearing on Vickie's counterclaim. On the first day, Judge Bufford conducted an unusual press conference of sorts on the record, where he responded to reporters' questions, noted that the case was related to the Texas probate litigation, and explained the procedures by which reporters could obtain public records or court filings. Approximately eleven months later, Judge

---

[4] Judge Keller's October 21, 1998 minute order granted Pierce's motion to withdraw with respect to Pierce's defamation claim and Vickie's counterclaim. Vickie's Chapter 11 petition, Pierce's proof of claim, and aspects of Pierce's defamation claim that pertained to dischargeability of debt, as well as all pending discovery matters were to remain before the bankruptcy court. The minute order also indicated that "[a]ll discovery matters which the bankruptcy judge determines are necessary to the 'core' bankruptcy proceedings . . . shall proceed before the bankruptcy court."

[5] The contents of the memorandum remain undisclosed.

Bufford entered judgment in Vickie's favor and against Pierce in the amount of $449,000,000, with an additional punitive damages award of $25,000,000. *See Marshall v. Marshall* (*In re Marshall*), 257 B.R. 35, 39, 40 (Bankr. C.D. Cal. 2000).[6] Judge Bufford acknowledged that the damages were "mainly based" on facts that were presumed to be true by virtue of his final sanctions order.[7]

Several months later, the Texas probate court rendered judgment in favor of Pierce in the probate case, ordering Vickie to pay Pierce's attorneys' fees in the amount of $541,000. The Probate Court later modified its order to specify that the fee award arose solely out of conduct that occurred after Vickie's bankruptcy discharge. However, Judge Bufford overturned the probate court's fee award, finding that it violated Vickie's bankruptcy discharge and was barred by judicial estoppel. The district court affirmed Judge Bufford's decision, but we reversed and remanded, finding that the attorneys' fees award did not violate Vickie's bankruptcy discharge, as it was based solely on conduct that occurred after the discharge. *Marshall v. Marshall* (*In re Marshall*), 119 F. App'x 136 (9th Cir. 2004).

---

[6] The Supreme Court ultimately held that the bankruptcy court lacked constitutional authority to enter a final judgment on Vickie's common law tort counterclaim. *Stern v. Marshall*, 131 S. Ct. 2594, 2601 (2011).

[7] Judge Bufford *sua sponte* withdrew the final sanctions order on January 18, 2000. However, his October 6, 2000, decision on Vickie's tortious interference counterclaim identified a number of factual findings the court deemed established as discovery sanctions against Pierce.

## II.

### The J. Howard Marshall III Case

Howard also challenged J. Howard's estate plan, arguing that, *inter alia*, Pierce had exerted undue influence over their father for years, the estate plan had been formulated under duress, and the will was invalid and unenforceable. In his capacity as trustee of the Trusts, Pierce filed a fraud counterclaim against Howard.[8] After a lengthy trial, the jury found in favor of Pierce, and the probate court entered a Second Modified Final Judgment against Howard ("the Fraud Judgment") on December 7, 2001. At the time Howard and Ilene filed their bankruptcy petition, the Fraud Judgment exceeded twelve million dollars.[9]

Howard filed an appeal in the Texas courts, and on January 31, 2002, moved to stay execution of the Fraud Judgment, or in the alternative, to lower the amount of security for a supersedeas bond. As part of that motion, Howard submitted a sworn affidavit attesting to a total net worth of $22,413,220. Elaine contends that the parties engaged in numerous efforts to negotiate a potential

---

[8] Howard claimed that J. Howard had orally promised to divide his estate equally between his two sons after Howard agreed to sell back to J. Howard voting shares of Koch Industries. In his fraud counterclaim, Pierce argued that J. Howard had disinherited Howard in 1980, that no such oral promise was ever made, and that Howard purposely sold his shares back to J. Howard in order to later concoct the claim that the sale was consideration for his father's oral promise to divide his estate equally between his sons.

[9] The probate court's modified Fraud Judgment reflects a substantial reduction from the jury's original $34 million judgment against Howard.

settlement, which eventually resulted in an agreement to stay enforcement in return for a $10.4 million bond, but that Howard ultimately reneged on the agreement when he was unable to finance the bond. Pierce moved to enforce the Fraud Judgment, and at a July 18, 2002, hearing, the probate court suggested that Howard voluntarily move assets to Texas to satisfy the judgment. The probate court scheduled another hearing for July 25, 2002 to consider whether it would order Howard to transfer assets to Texas.

On July 23, 2002, Howard and Ilene (collectively, "the Debtors") filed a Chapter 11 bankruptcy petition in the Central District of California. In connection with the petition, they filed a Statement of Related Cases and an addendum noting that Vickie's bankruptcy case involved a similar factual background and many of the same principal parties as their case. The Clerk assigned Howard and Ilene's case to Judge Bufford.

### III.

### E. PIERCE MARSHALL'S MOTION FOR RECUSAL AND REASSIGNMENT

Several months later, Pierce moved for random reassignment of the case, or alternatively, recusal of Judge Bufford, pursuant to 28 U.S.C. § 455(a) and the Due Process Clause. Judge Bufford denied Pierce's motion at an October 29, 2002 hearing. He subsequently issued an Order to Show Cause ("OSC") why the motion should not be denied on the basis of standing because Pierce had not filed a proof of claim in Howard and Ilene's case. After a hearing on the OSC, Judge Bufford issued a March 27, 2003 amended written opinion in which he assumed that Pierce had standing

(because the time for filing a proof of claim had not elapsed) and again denied the recusal motion. Pierce never filed a proof of claim in the Debtors' bankruptcy case.[10]

## IV.

### Pierce's Objection to the Chapter 11 Plan and Motion to Dismiss

The Debtors' initial plan of reorganization listed total assets of $8,391,904, personal property valued at $6,084,922, and identified the Texas Fraud Judgment as a disputed unsecured debt. Howard and Ilene filed an amended plan of reorganization on April 16, 2003 ("the Plan"). This time, the Plan provided for full payment of all debts except the Fraud Judgment, which the Plan proposed should nevertheless be discharged.

Pierce objected to the Debtors' proposed Plan on the grounds that it was unconstitutional and proposed in bad faith. Pierce argued that Howard and Ilene had initiated bankruptcy proceedings for the sole purpose of avoiding enforcement of the Fraud Judgment, that the Debtors misrepresented the value of assets and liabilities in their amended plan, and that Howard and Ilene were solvent and could easily satisfy their financial obligations without resort to bankruptcy. Citing similar concerns, Pierce also moved to dismiss the Debtors' Chapter 11 petition on the grounds of unconstitutionality and bad faith.

---

[10] Elaine admits that Pierce deliberately refrained from filing a proof of claim in the Debtors' case to avoid potential counterclaims such as those brought against him in Vickie's case.

Howard and Ilene argued that they had filed their suit and proposed their Plan in good faith, based not only on their inability to pay the Fraud Judgment, but also on the threat of future litigation with Pierce and others which they claimed could cost them upwards of $100 million.

On August 26, 2003, Judge Bufford issued a written opinion confirming the Debtors' Plan and denying Pierce's motion to dismiss on bad faith grounds. Then, on October 9, 2003, he issued a second amended opinion rejecting Pierce's constitutional challenge. Pierce appealed all three of Judge Bufford's decisions to the district court, Judge David O. Carter, presiding, which affirmed on March 18, 2009.[11] This appeal followed.

## DISCUSSION

We review de novo a district court's decision on appeal from a bankruptcy court. *Greene v. Savage* (*In re Greene*), 583 F.3d 614, 618 (9th Cir. 2009). As to the decision of the bankruptcy court, we apply the same standard of review applied by the district court. *Id.* However, we review the bankruptcy court decision independently and without deference to the district court's decision. *Strand v. Neary* (*In re Strand*), 375 F.3d 854, 857 (9th Cir. 2004).

---

[11] Judge Carter denied Pierce's request for a stay without bond pending appeal of the bankruptcy opinions. However, we granted a stay pending decision of the district court and also pending resolution of Vickie's case in the Supreme Court (*Stern v. Marshall*, 131 S. Ct. 2594 (2011)). Although both decisions have now been rendered, consummation of the Plan remains stayed pursuant to the district court's July 27, 2012 Order. *See* Order Granting Appellant's Motion for Stay at 4, *In re Marshall*, 8:03-cv-01354-DOC, Docket no. 127 (C.D. Cal. July 27, 2012), ECF No. 127.

# I.

## MOTION FOR REASSIGNMENT OR RECUSAL

We first address Elaine's contention that the district court erred in affirming the bankruptcy court's denial of her Motion for Reassignment or Recusal. We review the denial of a § 455(a) motion for recusal for abuse of discretion. *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000). "A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its decision on a clearly erroneous finding of material fact." *Brotby v. Brotby* (*In re Brotby*), 303 B.R. 177, 184 (B.A.P. 9th Cir. 2003). "We examine the bankruptcy court's conclusions of law de novo and its factual findings for clear error." *BCE W., L.P. v. Smith* (*In re BCE W., L.P.*), 319 F.3d 1166, 1170 (9th Cir. 2003).

"Clear error exists only when the reviewing court is left with a definite and firm conviction that a mistake has been committed." *In re Brotby*, 303 B.R. at 184. "If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous." *Lehtinen v. Lehtinen* (*In re Lehtinen*), 332 B.R. 404, 411 (B.A.P. 9th Cir. 2005). De novo review applies to Elaine's claim that Judge Bufford's partiality violated due process. *See In re Victoria Station Inc.*, 875 F.2d 1380, 1382 (9th Cir. 1989).

## A.

### REASSIGNMENT

Pursuant to 28 U.S.C. § 137, cases are to be assigned among judges in the manner prescribed by local rules and general orders of the court. In the Central District of

California, General Order 08-05 § 1.2 (2008), which applies equally to bankruptcy courts, directs the Clerk to assign cases to judges in the district randomly.[12]  Gen. Order 08-05 § 1.2 ("The assignment of civil cases shall be completely at random through the Automated Case Assignment System (ACAS)."). However, where cases are related, the Clerk is directed to assign the new case to the same judge who presided over the prior case.[13]  Gen. Order 08-05 § 5.2 (2008); Bankr. C.D. Cal.

---

[12] At the time the Debtors filed their bankruptcy petition, the operative provision was General Order 224 § 1.2 (1993).  The terms of that provision have been consolidated and superseded several times, but now exist in substantially the same form within General Order 08-05 § 1.2 (2008).

[13] In bankruptcy cases, the parties must file a 1015-2 statement of related cases. Under Local Bankruptcy Rule 1015-2(a) (formerly, Rule 1015-2(1)) cases are deemed "related" if the earlier case was filed or pending before the new petition was filed and the debtors:

> (1)  Are the same;
>
> (2)  Are spouses, former spouses, domestic partners, or former domestic partners;
>
> (3)  Are "affiliates," as defined in 11 U.S.C. § 101(2), except that 11 U.S.C. § 101(2)(B) shall not apply;
>
> (4)  Are general partners in the same partnership;
>
> (5)  Are a partnership and one or more of its general partners;
>
> (6)  Are partnerships that share one or more common general partners; or
>
> (7)  Have, or within 180 days of the commencement of either of the related cases had, an interest in property

Gen. Order 11-01 (2011) (formerly, Gen. Order 99-02 (1999)).

Elaine contends that assignment of the Debtors' bankruptcy case to Judge Bufford was improper because the two cases were not related, notwithstanding the Debtors' listing of the Vickie case in their 1015-2 Statement of Related Cases. The Debtors concede, and we agree, that the Debtors' bankruptcy case is not technically related to Vickie's case under Local Bankruptcy Rule 1015-2(a).[14] However, the court has "broad discretion" to interpret the requirements of its General Orders. *United States v. DeLuca*, 692 F.2d 1277, 1281 (9th Cir. 1982) ("Because general orders and local rules not only implement due process and other statutory rights but also promote efficiency, we permit the district court broad discretion in determining their requirements."); *United States v. Torbert*, 496 F.2d 154, 157 (9th Cir. 1974) (noting that a general order requiring random reassignment when a case is returned to the clerk after a judge is disqualified "is a housekeeping rule for the internal operation of the district court which has a large measure of discretion in interpreting and applying it" (internal quotation marks omitted)). While not technically "related," the Debtors' and Vickie's bankruptcy cases involved convoluted facts and issues, many of which had also been heavily litigated in the Texas probate court. Assignment of the case to Judge Bufford was within the court's discretion and was in the interests of efficiency.

---

that was or is included in the property of another estate under 11 U.S.C. § 541(a), § 1115, § 1207, a n d / o r § 1306.

[14] In fact, the Debtors explained that the cases were not technically related in the very Statement of Related Cases at issue here.

Moreover, judges are vested with "inherent" authority to transfer cases among themselves "for the expeditious administration of justice." *United States v. Stone*, 411 F.2d 597, 598 (5th Cir. 1969) (per curiam); *see also Badea v. Cox*, 931 F.2d 573, 575 (9th Cir. 1991) ("District court judges have broad discretion regarding the assignment or reassignment of cases." (internal quotation marks omitted)).  Had the Debtors' case been randomly assigned, it is likely that the assigned judge would have transferred the case to Judge Bufford, given his superior knowledge of the complex factual and procedural history of the parties' dispute in the Texas probate court.

Finally, a party has no due process right to random case assignment or to ensure the selection or avoidance of any particular judge absent a showing of bias or partiality in the proceedings. *See Cruz v. Abbate*, 812 F.2d 571, 574 (9th Cir. 1987) (explaining that "a [party] has no right to any particular procedure for the selection of the judge[,]" so long as the decision is made "in a manner free from bias or the desire to influence the outcome of the proceedings"); *Torbert*, 496 F.2d at 157 (holding that non-random assignment of a case did not violate due process, particularly because there was no showing of actual prejudice resulting from the procedural irregularity).  As discussed *infra* Section I.B., Elaine has not established actual or apparent bias on the part of Judge Bufford, and was therefore not prejudiced by the non-random assignment.

## B.

### RECUSAL

Elaine contends that Judge Bufford should have recused himself from the Debtors' bankruptcy case pursuant to 28 U.S.C. § 455. Section 455(a) requires recusal when "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *F.J. Hanshaw Enters., Inc., v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1144 (9th Cir. 2001).

First, Elaine argues that Judge Bufford failed to apply the correct legal standard in denying recusal. During a hearing on the recusal motion, Judge Bufford stated that the "[a]ppearance of impropriety is not a basis for recusal." This was undeniably a misstatement of the law. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) ("The goal of section 455(a) is to avoid even the appearance of partiality." (quoting *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.3d 796, 802 (5th Cir. 1986))). Proof of actual bias is not required under § 455(a). Instead, bias should "be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "It is well established that the recusal inquiry must be made from the perspective of a reasonable observer who is informed of all surrounding facts and circumstances." *Cheney v. U.S. Dist. Ct.*, 541 U.S. 913, 924 (2004) (emphasis and internal quotation marks omitted).

Nevertheless, Judge Bufford articulated the correct standard in his subsequent written opinion and specified that his denial of recusal was based "on the grounds stated in the

court's decision of this date." Thus, we find that Judge Bufford ultimately applied the correct legal standard. The salient inquiry, then, is whether Judge Bufford abused his discretion in concluding that his conduct in the Vickie case did not give rise to an appearance of bias against Pierce that warranted his recusal from the Debtors' proceedings.

Elaine contends that Judge Bufford's impartiality may be reasonably questioned in light of his handling of Vickie's case. Specifically, she claims that Judge Bufford's rulings demonstrated partiality towards Vickie, that his issuance of severe discovery sanctions and "critical" statements against Pierce and Pierce's attorney throughout the proceedings indicated prejudice against Pierce, and that his communications with the press and the district court evinced an uncommon interest in the case.

As a preliminary matter, we note that Elaine's examples of bias emanate exclusively from Judge Bufford's rulings and conduct during Vickie's case. Insofar as Elaine points to Judge Bufford's judicial rulings as evidence of bias, such "rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. "Almost invariably, they are proper grounds for appeal, not for recusal." *Id.* Moreover, "the judge's conduct during the proceedings should not, except in the 'rarest of circumstances' form the sole basis for recusal under § 455(a)." *United States v. Holland*, 519 F.3d 909, 913–14 (9th Cir. 2008) (quoting *Liteky*, 510 U.S. at 555). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair

judgment impossible." *Liteky*, 510 U.S. at 555. We find that Judge Bufford's conduct in Vickie's case does not satisfy this standard.

For example, Elaine contends that Judge Bufford advocated for Vickie by ruling in her favor on arguments neither raised nor briefed by the parties. While Judge Bufford may have erred in basing certain rulings on arguments not raised by the parties and without giving the parties an opportunity to respond, doing so several times in the course of lengthy and complicated litigation does not reasonably give rise to an inference that he is advocating for one side or another. Further, Elaine's argument suffers from the fact that neither Vickie nor Pierce were parties to Howard and Ilene's bankruptcy case.[15] Thus, Judge Bufford's purported partiality toward Vickie (or antagonism towards Pierce), even if true, does not reasonably give rise to an appearance of bias in Howard and Ilene's case.

Elaine also argues that, after initially denying Pierce's recusal motion, Judge Bufford instigated an improper *sua sponte* investigation to find additional grounds for denying the motion. Judge Bufford issued an OSC why the motion should not be denied for lack of standing, in light of Pierce's failure to file a proof of claim. We find nothing unusual or improper in the bankruptcy court's effort to determine

---

[15] As a practical matter, Judge Bufford's purported bias against Pierce would not spill over into Howard and Ilene's bankruptcy case unless and until Pierce injected himself into the case by filing a proof of claim, which he had not done by the time Judge Bufford ruled on the recusal motion. This is true notwithstanding the fact that the time in which to file a proof of claim had not yet elapsed. Section 455(a) cannot reasonably be read to require recusal based on speculation that a particular party might subsequently enter in the case.

whether a party has standing to litigate; in fact, such determination is required. *See B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999) ("[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing.").

As further evidence of bias, Elaine points to Judge Bufford's decisions declaring the district court's stay of his initial discovery sanctions ineffective and reimposing virtually the same sanctions in his Final Sanctions Order. Presumably, Elaine is insinuating that Judge Bufford openly defied the district court in order to ensure that Pierce would remain subject to his virtually insurmountable terminating sanctions. However, not only are judicial rulings rarely a basis for recusal, *Liteky*, 510 U.S. at 555, these particular rulings cannot reasonably be seen as contravening the district court's direction. The district court subsequently adopted Judge Bufford's Final Sanctions Order, notwithstanding its similarity to the initial vacated order, and even *increased* the damages award against Pierce. *In re Marshall*, 275 B.R. 5, 58 (C.D. Cal. 2002), *rev'd on other grounds*, 392 F.3d 1118 (9th Cir. 2004), *rev'd and remanded*, *sub nom. Marshall v. Marshall*, 126 S. Ct. 1735 (2006), *rev'd on remand*, 600 F.3d 1037 (9th Cir. 2010), *aff'd*, *sub nom. Stern v. Marshall*, 131 S. Ct. 2594 (2011).

With respect to the sanctions themselves, the district court's decision to increase Judge Bufford's sanctions significantly weakens Elaine's contention that the heavy sanctions create an appearance of bias on Judge Bufford's part. *See Offutt v. United States*, 348 U.S. 11, 15–16 (1954) (holding that heavy sanctions, which were later *reduced* by a higher court, constituted "compelling proof" of bias). Moreover, a reasonable person could find, as the district court

did, that Judge Bufford's decision to sanction Pierce was based on his perception of Pierce's bad faith. *See United States v. Yagman*, 796 F.2d 1165, 1181–82 (9th Cir. 1986) ("When [a judge imposes sanctions], the judge will obviously be dissatisfied with some aspect of the offending attorney's conduct[,]" but "[w]ithout more, this natural responsive attitude does not provide reasonable grounds to question the judge's impartiality[.]"). Judge Bufford found that Pierce committed numerous discovery abuses throughout the Vickie case. His determination was affirmed by the district court, and Pierce apparently elected not to raise the issue again on appeal of that decision to this court.[16] *See In re Marshall*, 392 F.3d 1118 (9th Cir. 2004). The record does not indicate that Judge Bufford's findings of sanctionable discovery abuse were erroneous. Thus, neither the existence nor the scope of the sanctions suggest that Judge Bufford harbored deep-seated antagonism against Pierce.

Similarly, Judge Bufford's comments towards Pierce and his attorney during Vickie's case might also be reasonably seen as the product of Judge Bufford's frustration with Pierce's behavior throughout the litigation. *See F.J. Hanshaw Enters., Inc.*, 244 F.3d at 1144–45 ("[P]redispositions developed during the course of a trial will [rarely] suffice." (citing *Liteky*, 510 U.S. at 544–45)); *United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980)

---

[16] Although the Supreme Court ultimately determined that the bankruptcy court did not have jurisdiction over Vickie's counterclaims, the propriety of the Final Sanctions Order was not ultimately decided in either venue. *See In re Marshall*, 600 F.3d 1037, 1046 n.17 (9th Cir. 2010) (noting that the Court's "discussion of these matters" would be "limited" as "the parties agreed that there [were] no sanctions issues . . . on appeal" and because "Pierce . . . [was] entitled to judgment in his favor for other reasons . . .").

(explaining that recusal under § 455(a) requires a finding of "an animus more active and deep-rooted than an attitude of disapproval toward certain persons because of their known conduct"). For example, Judge Bufford referred to Pierce as "a Defendant with extremely dirty hands," told Pierce's counsel to bring certain documents to court or "bring [his] toothbrush," to bring his "checkbook" to a hearing, and that he had "substantial experience with the way [Pierce's] side has handled cases." These statements, while potentially indicative of personal bias, are not serious enough to overcome the high standard set forth in *Liteky*:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal *such a high degree of favoritism or antagonism as to make fair judgment impossible*.

510 U.S. at 555 (emphasis added).

Elaine also contends that Judge Bufford's communications with the press gave rise to an appearance of partiality. Judge Bufford primarily took questions from reporters about the procedures for obtaining court documents and records. These procedural comments, themselves, do not indicate partiality and are not ethically proscribed. *See* Code of Judicial Conduct Canon 3(A)(6) ("This proscription [on judicial speech] does not extend to public statements made in the course of the judge's official duties, to the explanation of court procedures, or to a scholarly presentation made for

purposes of legal education."); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 112 (D.C. Cir. 2001) (distinguishing between "purely procedural matters," which the district judge may properly discuss in public, and the judge's "views on factual and legal matters at the heart of the case," upon which the judge may not publicly comment).

However, the fact that Judge Bufford initiated the "press conference" at all is highly unusual and of some concern. *See In re Boston's Children First*, 244 F.3d 164, 170 (1st Cir. 2001) (noting that, in highly publicized cases, "even ambiguous comments may create the appearance of impropriety" and "[i]n fact, the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias"); *see also United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993) (holding that a judge's deliberate choice to express "strong views" on a pending case in a media forum "conveyed an uncommon interest . . . in the subject matter" and "created the appearance that the judge had become an active participant in [the litigation]").

Furthermore, in speaking with the press, Judge Bufford mentioned the interplay between the Texas probate case and Vickie's bankruptcy case, explaining that there were some overlapping issues that might be resolved in either venue. Given that the bankruptcy court's jurisdiction over Vickie's counterclaim was in dispute, such statements might be viewed as commentary on the merits of the case. *See In re Boston's Children First*, 244 F.3d at 170 (concluding that a judge's comment that one case was more "complex" than another could be seen as "a preview of a ruling on the merits of petitioner's motion for class certification" and called the

judge's impartiality into question). While there is nothing wrong with a court providing procedural information to the press in a highly publicized case, an appearance of impropriety may be created where a judge voluntarily takes on that role, especially in open court during the course of the proceedings.

Still, notwithstanding our concerns, Judge Bufford's statements to the press are in and of themselves insufficient to warrant recusal. The lion's share of his comments dealt with courtroom procedures and policies, which is understandable given the strong media interest in Vickie's case. That several of his comments might be construed as a vague reflection on a disputed jurisdictional issue does not, alone, compel a finding of apparent bias.

In addition, Elaine makes much of a private communication Judge Bufford shared with Judge Keller regarding Pierce's motion to withdraw the bankruptcy reference. She argues that, by sending Judge Keller a "secret memorandum," Judge Bufford injected himself into the case under the guise of "assisting" Judge Keller's decision on whether to withdraw the reference, evincing an "uncommon interest and degree of personal involvement" in Vickie's case. *Cooley*, 1 F.3d at 995. However, context matters, and the record here does not support that conclusion.

In October 1998, Judge Keller issued a minute order withdrawing the bankruptcy reference in part. The minute order indicated that the bankruptcy judge would determine which discovery matters were necessary to "core" bankruptcy proceedings and should therefore remain before the bankruptcy court. At a January 1999 hearing, Howard and Ilene's counsel reminded Judge Bufford that the bankruptcy

court "was going to be coming out with an order with respect to th[e] Court's belief as to the jurisdictional responsibilities . . . which Judge Keller['s] . . . minute order indicated he was awaiting." Judge Bufford clarified that his response to Judge Keller would "not take the form of an order[,]" but would be "a memorandum to Judge Keller to assist in his review of the matter." Judge Bufford then noted that the memo would be "an internal document not available to the parties." After receiving the memo, Judge Keller noted that "as far as the memorandum that [Judge Bufford] shared with me, he does have authority to try everything but the MPI case, as far as I can tell." Judge Keller acknowledged that he was "not as deeply into it from a bankruptcy standpoint as [Judge Bufford was]," and that Judge Bufford was the one who "kn[ew] what[ was] going on."

Although we are not privy to the contents of Judge Bufford's communication, this context strongly suggests that Judge Bufford's memo dealt with legitimate jurisdictional issues, and that Judge Bufford was merely responding to a request made by Judge Keller. At any rate, the record does not suggest that Judge Bufford was actively trying to retain jurisdiction over Vickie's case because of antagonism or favoritism towards the parties, as opposed to, for example, his understandable reticence to foist a complex case on the district court unless it was necessary to do so.

Elaine's examples of bias are almost exclusively based on Judge Bufford's conduct during Vickie's bankruptcy proceedings. Taken together, Judge Bufford's actions are not indicative of a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. As such, this case is not one of the "rarest of circumstances" where judicial conduct in prior proceedings

should form the sole basis for recusal under § 455(a). *Holland*, 519 F.3d at 914. Judge Bufford's determination—that under all of the circumstances a reasonable person would not question his impartiality—does not reflect an incorrect application of the law and is not based on clearly erroneous factual findings. Therefore, we cannot say that Judge Bufford abused his discretion in denying Elaine's motion to recuse.[17]

## II.

### CONSTITUTIONAL ISSUES

For the reasons outlined in the second amended opinion of the bankruptcy court filed on October 9, 2003, in the Central District of California, we conclude that the district court correctly affirmed the bankruptcy court's confirmation of Howard and Ilene's Chapter 11 plan and denial of Elaine's motion to dismiss with respect to the constitutional issues raised in the motion. *See In re Marshall*, 300 B.R. 507 (Bankr. C.D. Cal. 2003). Therefore, we adopt the bankruptcy court's opinion on Elaine's constitutional claims, and affirm the district court's decision as to the issues addressed therein. *See* Appendix A.

---

[17] Furthermore, the record does not suggest that "the probability of actual bias" on Judge Bufford's part was "too high to be constitutionally tolerable[,]" so as to mandate his recusal on due process grounds. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

## III.

### NON-CONSTITUTIONAL ISSUES

Elaine contends that the bankruptcy court erred in confirming the Debtors' Chapter 11 Plan because the Plan does not satisfy the "Best Interests of Creditors" test and was proposed in bad faith. Elaine also argues that the bankruptcy case should have been dismissed because it was filed in bad faith.

We review the bankruptcy court's decision to confirm the Debtors' Chapter 11 Plan for abuse of discretion. *In re Brotby*, 303 B.R. at 184. The bankruptcy court's ruling on a motion to dismiss for bad faith is also subject to review for abuse of discretion. *Stolrow's Inc. v. Stolrow's Inc.* (*In re Stolrow's, Inc.*), 84 B.R. 167, 170 (B.A.P. 9th Cir. 1988). In both cases, "[t]he question of good faith is factual" and we review for clear error. *Id.*; *Marsch v. Marsch* (*In re Marsch*), 36 F.3d 825, 828 (9th Cir. 1994) (per curiam).

### A.

### PLAN CONFIRMATION—BEST INTERESTS OF CREDITORS TEST

The so-called "Best Interest of Creditors" test requires that:

> [w]ith respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A).

Because the Plan purported to discharge the Texas Fraud Judgment without any payment, Elaine contends that the Plan failed to ensure that Pierce would receive at least as much as he would have under Chapter 7 liquidation. However, *Pierce never filed a proof of claim* in the Debtors' Chapter 11 proceedings, and the deadline for doing so had passed by the time the bankruptcy court confirmed the Debtors' Chapter 11 Plan. Thus, § 1129(a)(7)(A) did not apply to Pierce or to the Fraud Judgment.

That Pierce would not have been foreclosed from filing a proof of claim under Chapter 7 is of no moment. *See* 11 U.S.C. § 726(a)(2) (permitting late-filed claims in Chapter 7 cases). We will not extend the "Best Interests of Creditors" test to individuals who are only hypothetically creditors, simply because the statute invokes a hypothetical Chapter 7 liquidation as a point of reference. Were we to go that far, a Chapter 11 Plan would not be confirmable unless it provided for all individuals who could potentially be entitled to distribution. Such a result would be untenable in practice and would eviscerate the proof of claim filing deadline in Chapter 11.

**B.**

**PLAN CONFIRMATION—BAD FAITH**

Under 11 U.S.C. § 1129(a)(3), a bankruptcy plan must be "proposed in good faith and not by any means forbidden by law." "A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code." *Sylmar Plaza, L.P. v. Sylmar Plaza L.P.* (*In re Sylmar Plaza, L.P.*), 314 F.3d 1070, 1074 (9th Cir. 2002).

Elaine argues that the Plan was not proposed in good faith because the Debtors (1) were actually solvent; (2) misrepresented the true value of their assets; and (3) filed the petition with the primary purpose of avoiding payment of the Texas Fraud Judgment.

We agree that the Debtors' claim of potentially costly future litigation— including a $5 million Louisiana lawsuit in which Howard was a named defendant and Pierce's separate threat of a $100 million lawsuit—was perhaps too speculative to support a finding that they were "insolvent." However, "insolvency is not a prerequisite to a finding of good faith under § 1129(a)." *Id.* at 1074–75. The bankruptcy court reasonably concluded that the Debtors' technical solvency did not bespeak bad faith given that they faced the threat of future litigation, not to mention their very concrete obligation to satisfy the Texas Fraud Judgment, amounting to nearly $12 million.

With regard to the Debtors' purported misstatements on their asset schedule, the chief example cited by Elaine was the listing of the value of the Eleanor Stevens Gift Trust Debenture as "contingent," despite its prior valuation at

upwards of $6 million.[18]        However, the Debtors'
identification and description of the debenture and other stock
holdings were more than sufficient to put creditors on notice
of the assets so they could investigate further. *See, e.g.*,
*Cusano v. Klein*, 264 F.3d 936, 946–47 (9th Cir. 2001)
(holding that, while a debtors must "be as particular as is
reasonable under the circumstances[,]" there are "no bright-
line rules for how much itemization and specificity is
required," and where the value of assets are unknown, "a
simple statement to that effect will suffice" (citations and
internal quotation marks omitted)); *In re Weingarten*, No. 05-
01091, 2013 WL 309076, at *12 (Bankr. C. D. Cal. Jan. 25,
2013) ("By listing the asset, even one with an unknown value,
[the debtor] has put parties on notice of these assets and they
can investigate further."). Further, with regard to the
Debtors' failure to list certain assets, the bankruptcy court did
not clearly err in finding that the omitted assets—200 shares
of stock, worth roughly $175–180 per share, and Citibank
accounts containing $186,458—were *de minimis* and
unproven, respectively.

Finally, Elaine argues that the Plan was proposed in bad
faith because the Debtors' primary purpose was to avoid
paying the Texas Fraud Judgment. However, the only reason
consummation of the Debtors' Plan would frustrate Elaine's

---

[18] In addition, while the asset schedule stated the value of the Debtors'
stock holdings as "unknown," Elaine points to Howard's Probate Affidavit
which valued his stock holdings in the millions of dollars and a monthly
statement from his investment advisor indicating that Howard's stock
holdings were worth $5,891,141.65. Elaine also claims that the amended
schedules improperly listed the "book value" of certain assets, rather than
market value and "inexplicably" valued various partnership interests at
just one hundred dollars each. According to Elaine, Howard and Ilene's
assets actually exceeded their stated liabilities by at least $4,000,000.

attempt to collect on the Texas Fraud Judgment was because Pierce never filed a proof of claim. Significantly, the Debtors initially *included* the Fraud Judgment in their Plan, and amended to provide for discharge of the judgment only after Pierce failed to file a proof of claim. We find no reason to conclude that the Debtors knew Pierce would not file a proof of claim and we see nothing that prevented him from doing so.

In sum, the bankruptcy court's finding that the Debtors' Plan was proposed in good faith was not clearly erroneous under all the circumstances. Therefore, confirmation of the Debtors' Plan was not an abuse of discretion.

## C.

### MOTION TO DISMISS—BAD FAITH

Under 11 U.S.C. § 1112(b), a Chapter 11 bankruptcy case may be dismissed "for cause." "Although section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal." *In re Marsch*, 36 F.3d at 828. The good faith requirement does not depend on a debtor's subjective intent, but rather "encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings." *Id.* Generally, a plan is not filed in good faith if it represents an attempt "to unreasonably deter and harass creditors" and to "achieve objectives outside the legitimate scope of the bankruptcy laws." *Id*.

The question of a debtor's good faith "depends on an amalgam of factors and not upon a specific fact." *Id.*

(quoting *Idaho Dep't of Lands v. Arnold* (*In re Arnold*), 806 F.2d 937, 939 (9th Cir. 1986)). "[T]he courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va.* (*In re Phoenix Piccadilly, Ltd.*), 849 F.2d 1393, 1394 (11th Cir. 1988) (quoting *Albany Partners, Ltd. v. Westbrook* (*In re Albany Partners, Ltd.*), 749 F.2d 670, 674 (11th Cir. 1984)). A "[d]ebtor bears the burden of proving that the petition was filed in good faith." *Leavitt v. Soto* (*In re Leavitt*), 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997) (citing *In re Powers*, 135 B.R. 980, 997 (Bankr. C.D. Cal. 1991)).

Elaine argues that the petition was filed in bad faith and should have been dismissed. First, Elaine contends that the timing of the filing, within days of the Texas court's suggestion that Howard transfer assets to satisfy the Fraud Judgment, indicated bad faith. We agree that the timing of Howard and Ilene's filing may be an indication that the Debtors initiated bankruptcy proceedings for the purpose of avoiding or delaying payment of the judgment. *See In re Leavitt*, 171 F.3d at 1225 (finding that the timing of debtor's bankruptcy petition, filed within two weeks of judgment, demonstrated that the debtor's primary motive was avoidance of the judgment). However, because the Debtors specifically included the Texas Fraud Judgment in their initial Plan, it appears just as likely that they filed their petition in order to "effect a speedy, efficient reorganization," and not "to unreasonably deter and harass creditors." *In re Marsch*, 36 F.3d at 828.

In addition, Elaine argues that the Debtors' sole purpose in filing the petition was to avoid filing a supersedeas bond pending appeal of the Texas Fraud Judgment. In *Marsch*, we

held that a petition was correctly dismissed for bad faith where it "was filed solely to delay collection of the judgment and avoid posting an appeal bond, even though debtor had the ability to satisfy the judgment with nonbusiness assets." *Id.* at 831; *see also In re Boynton*, 184 B.R. 580, 581 (Bankr. S.D. Cal. 1995) (finding bad faith where petition was filed in order to evade a tax judgment despite the fact that debtors had "significant assets" and "may have been able" to post a bond).

Here, unlike in *Marsch* and *Boynton*, the record suggests that Howard and Ilene's liquid assets were probably insufficient to satisfy the judgment or cover the cost of a supersedeas bond. The bankruptcy court found that the Fraud Judgment amounted to over $12 million plus interest, that the "custom" in Texas was to set appeal bonds at 150% of the judgment, and that Howard did not have sufficient liquid assets to post a bond of that size. Although the record does not invariably indicate that the Debtors could not finance a supersedeas bond, we cannot say that the bankruptcy court's determination was clearly erroneous. Moreover, notwithstanding their ability to finance a bond, Howard and Ilene's inclusion of the Fraud Judgment in their initial Plan suggests that they filed their bankruptcy petition for the proper purpose of reorganization, not as a mere ploy to avoid posting the bond.

Finally, Elaine contends that the absence of other unsecured creditors in the Plan shows that the Debtors filed their petition in order to avoid having to obtain a supersedeas bond or pay the Texas Fraud Judgment. *See, e.g.*, *Chinichian v. Campalongo* (*In re Chinichian*), 784 F.2d 1440, 1445 (9th Cir. 1986); *Little Creek Dev. Co. v. Common Wealth Mortg. Corp.* (*In the Matter of Little Creek*), 779 F.2d 1068, 1073

(5th Cir. 1986); *In re Silberkraus*, 253 B.R. 890, 904 (Bankr. C.D. Cal. 2000). Indeed, Howard and Ilene paid off at least $89,000 in unsecured debts the day before filing, and the Texas Fraud Judgment made up roughly 82% of the Debtors' total scheduled liabilities.

However, notwithstanding their minimal unsecured debt, the Debtors' decision to file for bankruptcy does not indicate bad faith in light of the size of the Texas Fraud Judgment and the potential cost of obtaining a bond. As the bankruptcy court noted, all debtors file for bankruptcy in order to delay creditor action. Thus, although the Debtors' main motivation may have been to ameliorate the burden of the judgment, given that the Plan proposed payment of the judgment, we cannot say that they filed a Chapter 11 petition in order to avoid paying it altogether, or to unduly deter or harass creditors.[19]

Moreover, we agree with the bankruptcy court that "[p]erhaps the most compelling grounds for denying a motion to dismiss grounded on bad faith is the determination that a reorganization plan qualifies for confirmation." This is because "[a] debtor's showing that a plan of reorganization is ready for confirmation essentially refutes a contention that the case is filed or prosecuted in bad faith." *Id.* The bankruptcy court properly considered the viability of the Debtors' proposed Plan as weighing heavily against dismissal.

---

[19] In support of her motion to dismiss based on bad faith filing, Elaine also relies on the arguments that the Debtors were solvent and misrepresented the value of their assets. We reject these arguments for the same reasons discussed *supra* section III.B.

Viewing  the amalgam of factors together, it is not "obvious that [the Debtors are] attempting unreasonably to deter and harass creditors[.]" *In re Thirtieth Place, Inc.*, 30 B.R 503, 505 (9th Cir. B.A.P. 1983) (quoting *Matter of Levinsky*, 23 B.R. 210, 218 (N.Y. Bankr. 1982)). Accordingly, the bankruptcy court's finding of good faith was not clearly erroneous, and it did not abuse its discretion in denying the motion to dismiss.

For the foregoing reasons, the district court's decision is **AFFIRMED.**

# APPENDIX A

In re J. Howard MARSHALL
et ux., Debtors.

No. LA 02–30769–SB.

United States Bankruptcy Court,
C.D. California.

Oct. 9, 2003.

Trustee of family trust filed his opposition to proposed Chapter 11 plan filed by his brother and his brother's wife and moved to dismiss their bankruptcy case on ground that they were not insolvent, and that Congress could not constitutionally provide for reorganization by solvent debtors. Amending and superceding prior opinion, the Bankruptcy Court, Samuel L. Bufford, J., held that: (1) bankruptcy law does not require that debtor be insolvent, either in "balance sheet" or in "liquidity" sense, in order to file Chapter 11 petition or to proceed to confirmation; (2) Congress has power under the Bankruptcy Clause to determine that debtor may invoke rights under the Bankruptcy Code to adjust his obligations before debtor becomes insolvent; and (3) allowing debtors who allegedly were not insolvent, in "balance sheet" sense, to file for Chapter 11 relief and to obtain confirmation of plan providing for discharge of their debts would not violate Fifth Amendment economic substantive due process rights of judgment creditor.

Plan confirmed; dismissal motion denied.

1. Bankruptcy ⚖2223, 3548.1

Bankruptcy law does not require that debtor be insolvent, either in "balance sheet" sense of having liabilities that exceed his assets or in "liquidity" sense of being unable to pay his debts as they become due, in order to file a Chapter 11 petition or to proceed to confirmation of plan of reorganization.

2. Bankruptcy ⚖2222.1

While Congress is not free to define contours of bankruptcy without any limitation, insolvency, whether in "balance sheet" or in "liquidity" sense, is not prerequisite for the constitutional invocation of federal bankruptcy jurisdiction. U.S.C.A. Const. Art. 1, § 8, cl. 4.

3. Bankruptcy ⚖2022

United States bankruptcy law is designed to provide relief from creditor pressures for debtors with cash flow difficulties, even when they are clearly solvent under "balance sheet" test.

4. Bankruptcy ⚖2222.1

Congress has power under the Bankruptcy Clause to determine that debtor may invoke rights under the Bankruptcy Code to adjust his obligations with creditors before debtor becomes insolvent under "balance sheet" test. U.S.C.A. Const. Art. 1, § 8, cl. 4; Bankr.Code, 11 U.S.C.A. § 101 et seq.

5. Constitutional Law ⚖277(1)
   Eminent Domain ⚖81.1

Property rights enjoy at least a measure of protection in bankruptcy under the Due Process and Just Compensation Clauses of the Fifth Amendment. U.S.C.A. Const.Amend. 5.

6. Bankruptcy ⚖2015

While property rights enjoy at least a measure of protection in bankruptcy, Congress is not barred from passing laws that impair obligation of contracts.

7. Bankruptcy ⚖2015

Very essence of bankruptcy laws is modification or impairment of contractual obligations.

**8. Bankruptcy ⟲2013.1**

**Constitutional Law ⟲306(4)**

Protection of property rights in bankruptcy is measured, and Congress, acting in its bankruptcy power, may authorize bankruptcy courts to affect such property rights, as long as limitations of due process are observed. U.S.C.A. Const. Art. 1, § 8, cl. 4; U.S.C.A. Const.Amend. 5.

**9. Bankruptcy ⟲2223, 3549**

**Constitutional Law ⟲306(4)**

Allowing Chapter 11 debtors who allegedly were not insolvent, in sense that their liabilities did not exceed their assets, to file for Chapter 11 relief and to obtain confirmation of plan providing for discharge of their debts would not violate the Fifth Amendment economic substantive due process rights of judgment creditor who had neither property nor contract rights to assert against debtors, and who, as result of his refusal to file proof of claim, did not even have claim against estate, but only a Texas state court judgment which was on appeal. U.S.C.A. Const.Amend. 5.

**10. Bankruptcy ⟲2019**

Congress validly exercised its bankruptcy powers under the Constitution to authorize debtors who are solvent, whether in "balance sheet" or in "liquidity" sense, to file Chapter 11 cases and obtain confirmation of reorganization plans. U.S.C.A. Const. Art. 1, § 8, cl. 4.

### West Codenotes

**Recognized as Unconstitutional**

Pub.L. No. 101-650, 101st Cong., 2d Sess. § 317(a) (1990).

**Validity Called into Doubt**

Bankr.Code, 11 U.S.C.A. § 106(a).

**Limitation Recognized**

Bankr.Code, 11 U.S.C.A. § 522(f).

———————

J. Howard Marshall, III, Ilene Marshall, Pasadena.

Bingham McCutchen, LLP, Julia Frost–Davies, Rheba Rutkowski, Andrew J. Gallo, Boston, MA.

Bingham McCutchen, LLP, G. Eric Brunstad, Jr., Hartford, CT.

Bingham McClutchen, LLP, Matthew A. Lesnick, Los Angeles.

David L. Neale/Anne E. Wells, Levene Neale Bender Rankin et al., Los Angeles.

## SECOND AMENDED OPINION ON PLAN CONFIRMATION AND MOTION TO DISMISS (CONSTITUTIONAL ISSUES)

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

In this case Pierce Marshall, as trustee for three family trusts (collectively referred to as "Pierce") opposes confirmation of the chapter 11 [1] plan proposed by the debtors, who are his brother J. Howard Marshall, III ("Howard") and Howard's wife Ilene O. Marshall. Pierce also moves to dismiss the case. Pierce supports both of these positions with the argument that this case falls outside the bankruptcy jurisdiction of the federal courts under the Bankruptcy Clause of the United States

---

**1.** Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 2003)

and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

Constitution, because the debtors are solvent under a balance sheet test. Notably, Pierce has declined to file a claim on behalf of the trusts (or on his own behalf) in this case.

The court finds that the balance sheet test for insolvency was unknown in United States bankruptcy law until 1898, when balance sheet insolvency first entered United States bankruptcy law. Prior thereto, insolvency in the bankruptcy context always meant liquidity (or equity) insolvency.

The court further holds that the Bankruptcy Clause of the United States Constitution does not require that a debtor in bankruptcy be insolvent under any test, and that the debtors in this case may constitutionally invoke remedies provided under chapter 11.

## II. Relevant Facts

The relevant facts in this case are set forth in the court's recently issued opinion on the non-constitutional issues involved in the pending plan confirmation and motion to dismiss. *See In re Marshall*, 298 B.R. 670 (Bankr.C.D.Cal.2003). The filing of this bankruptcy case was precipitated in part by a judgment in favor of Pierce and against Howard in the Texas probate case of their father J. Howard Marshall II ("J. Howard"). The judgment, which was then on appeal, was for $11 million plus costs and interest at ten percent. By the filing date of the bankruptcy petition, this debt totaled more than $12 million.

As amended, the debtors' schedules show assets worth $13,138,311.38 and liquidated debts of $13,914,112.39. In addition to the valued assets, the schedules disclose interests in a revocable family trust, claims made in the probate estate of Howard's father, J. Howard, and an interest in the Eleanor P. Stevens Irrevocable Gift Trust (which is described in detail in a full-page exhibit). In addition to the quantified debts, the schedules list nonpriority debts in unknown amounts owing to Wells Fargo Bank Texas, the City of Pasadena, a Dallas law firm and the Marshall Museum & Trust.

In addition to the $12 million judgment, Howard had been named as a defendant in a $5 million lawsuit in Louisiana. Furthermore, Pierce's lawyer also sent a letter to Howard's lawyer on May 20, 2002 providing substantial detail for another claim against Howard exceeding $100 million.

The court set a claims bar date of November 15, 2002. Pierce declined to file a proof of claim in this case. Pierce has moved to dismiss this case and has objected to the confirmation of the debtors' chapter 11 plan as amended.

Pierce makes both statutory and constitutional objections to the confirmation of the chapter 11 plan proposed by debtors Howard and Ilene Marshall. The court has previously found that the statutory requirements for confirmation are satisfied, and that the case should not be dismissed on good faith grounds. *See Marshall*, 298 B.R. at 675-684.

## III. Constitutionality of a Chapter 11 Case for a Solvent Debtor

Pierce contends that the debtors' assets exceed their liabilities as of the date of filing, and that in consequence they were solvent under a balance sheet test. The court finds that determining the accuracy of this contention would be very difficult and very time consuming in this case. While for some purposes in bankruptcy it is necessary to make such a determination,[2] in this case no such determination is

---

**2.** *See* § 546(c) (reclamation); § 547(b)(3)     (preferential transfer); § 548(a)(1)(B)(ii)(I)

necessary. For the purposes of the constitutional analysis, the court assumes without deciding that the debtors were solvent, in the balance sheet sense, when they filed this case.

**[1]** As a statutory matter, it is clear that the bankruptcy law does not require that a bankruptcy debtor be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of reorganization. The Ninth Circuit firmly rejected such a view in *Sylmar Plaza* where it held, "insolvency is not a prerequisite to a finding of good faith under § 1129(a)." *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),* 314 F.3d 1070, 1074–75 (9th Cir. 2002); *accord, In re James Wilson Associates,* 965 F.2d 160, 170 (7th Cir.1992) (rejecting bad faith challenge to confirmation).

Pierce concedes that insolvency is not a statutory requirement for filing a voluntary bankruptcy case under chapter 11. Instead, he argues that the Bankruptcy Clause of the United States Constitution can only be invoked by a bankruptcy debtor who is insolvent under a balance sheet test. Pierce argues that the constitutional grant of authority to Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States" [3] is limited to regulating the affairs of debtors who are insolvent in this sense.

Pierce argues that there must be some content to the Bankruptcy Clause in the Constitution. In general terms, this court agrees. On this point Pierce is on solid ground. Congress is not free to define the contours of bankruptcy without any limita-

tions: the bankruptcy terrain clearly must have some boundaries. *See, e.g., Continental Illinois Nat'l Bank & Trust v. Chicago, Rock Island & Pac. Ry. Co.,* 294 U.S. 648, 669–70, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

The test, according to Pierce, is that the Constitution must require that a debtor in a bankruptcy case be insolvent under a balance sheet test. Insofar as the Bankruptcy Code permits a bankruptcy filing by a debtor who is balance sheet solvent, according to Pierce, the law falls outside the powers granted by the Constitution to the federal government. In such a circumstance, the Constitution, and not the law, must govern the case. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803) ("If then . . . the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply.")

**[2]** The court finds that neither balance sheet insolvency nor liquidity insolvency is required for the constitutional invocation of federal bankruptcy jurisdiction. The limits on the application of the Bankruptcy Clause lie elsewhere, not in balance sheet insolvency.

As a preliminary matter, it is necessary to distinguish the exercise of powers under the Bankruptcy Clause from the exercise of congressional powers under the Commerce Clause. These two powers are closely related. *See Railway Labor Executives' Ass'n v. Gibbons,* 455 U.S. 457, 465–66, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982). However, the conditions for invoking the Commerce Clause are different from those for invoking the Bankruptcy Clause, and each has its own limitations.

(certain fraudulent transfers); § 553(a) (setoff).

**3.** U.S. Const., art. 1, § 8, cl. 4.

As the Supreme Court has explained, "[u]nlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power," and "if we were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws." *Id.* at 468–69, 102 S.Ct. 1169.

Setting aside the Commerce Clause, the powers granted to Congress under the Bankruptcy Clause are expanded by art. 1, § 8, cl. 18, which grants Congress the power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . ." *See Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 513, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938). Theoretically, this provision might be invoked to support the use of the Bankruptcy Clause in doubtful cases. However, the Supreme Court has never in fact utilized this approach to determine the constitutionality of bankruptcy provisions.

The court assumes without deciding that Congress was not exercising its Commerce Clause or its Necessary and Proper Clause powers in determining the qualifications for filing a bankruptcy case. Thus the court's constitutional analysis in this case is confined to the Bankruptcy Clause.

To analyze Pierce's argument, we examine the understanding of the framers of the Constitution at the time of its adoption, the history of bankruptcy law in the United States and its predecessor English statutes, and applicable Supreme Court case law. We also examine Pierce's argument that, insofar as the Bankruptcy Code permits a solvent chapter 11 debtor to file a case and proceed to plan confirmation, Congress has exceeded its Bankruptcy Powers and has deprived him of property without due process of law.

### A. Definition of Insolvency

Before undertaking this analysis, we must first address what Pierce means by "insolvency," because this term has two commonly used definitions in the bankruptcy context.

For the purposes of this argument, Pierce urges the court to adopt the balance sheet definition of solvency in § 101(32)(A), which states in relevant part:

"insolvent" means . . . with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate . . . .

Section 101(32)(A) states the Bankruptcy Code version of the balance sheet test for Insolvency.[4] Under the non-bankruptcy version, a debtor is insolvent where its liabilities exceed its assets as shown on its balance sheet. *See* BLACK'S LAW DICTIONARY 799 (7th ed.1999).

Section 101(32)(A) makes two modifications to the usual balance sheet insolvency test. First, the test requires the revision of balance sheet values to their "fair valuation." In contrast, a balance sheet prepared according to generally accepted accounting principles provides asset values at historical cost less any applicable depreciation or amortization. The "fair valuation" standard requires an adjustment in

---

**4.** The 1898 Act has a similar definition of insolvency. *See* 1898 Act, § 1(19). Unlike § 101(32)(A) of the Bankruptcy Code, § 1(19) of the 1898 Act included exempt property in the calculation of insolvency.

balance sheet values from historical cost to present market values. Second, the § 101(32)(A) definition excludes property that would otherwise appear on a balance sheet, but that is exempt under § 522 (providing exemptions for individual debtors).

The insolvency definition in § 101(32)(A) is designed to govern the handful of technical uses of this term in the Bankruptcy Code. In fact, "insolvent" is used only ten times in the entire statute, and in nine of those it is used to define narrowly drawn rights under particular statutory provisions. *See* § 365 (trustee may assume an executory contract notwithstanding a default relating to the debtor's insolvency); § 525 (protecting a debtor against discriminatory treatment during prepetition insolvency); § 541 (forfeiture based on insolvency does not prevent prepetition property from becoming property of the estate); § 543 (court may consider interests of equity holders of solvent debtor in determining whether to require a custodian to turn over property); § 545 (protecting a debtor from statutory liens predicated upon insolvency); § 546 (authorizing certain reclamation rights to creditors who have delivered certain goods to a debtor while insolvent before the bankruptcy petition was filed); § 547 (element of cause of action for preferential transfer); § 548 (element of certain causes of action for fraudulent transfers); § 553 (condition for prohibiting a creditor setoff). None of

these uses sheds any light on the constitutional limits of the Bankruptcy Clause.

The final use of "insolvency" in the Bankruptcy Code occurs in § 109(c)(3), which requires a municipality to be insolvent as a condition of filing a bankruptcy case. The meaning of "insolvency" in this provision is entirely different from the balance sheet test,[5] and is governed by § 101(32)(C), which states that "insolvent" means:

> with reference to a municipality, financial condition such that the municipality is—
>
> (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
>
> (ii) unable to pay its debts as they become due . . . .

This is known as the liquidity test for insolvency (also known as the "equity" or the "cash flow" test),[6] and it is the most commonly used definition in the bankruptcy context.[7] This liquidity definition of insolvency is the only one that has ever played a role in qualifying a person as a debtor under United States bankruptcy law.

[3] It is not uncommon for debtors to be solvent under the balance sheet test, and yet to have severe financial problems. This court frequently receives cases, filed under both chapter 7 and chapter 11 and especially under chapter 13 (a reorganization chapter for consumers), where the debtor is clearly solvent under a balance

---

**5.** Section 101(32)(B) also has a different definition of insolvency for a partnership, which is a modified version of the balance sheet test that takes into account the partners' separate assets.

**6.** This definition is also used in § 303(h)(1), which authorizes a court to order relief against an involuntary debtor if, "the debtor is generally not paying such debtor's debts as they

such debts become due unless such debts are the subject of a bona fide dispute . . . ."

**7.** There are other, more sophisticated measures of insolvency that are increasingly used in complex business transactions. *See e.g.,* Michael J. Epstein, *Director/Manager Liability and How to Avoid Furthering Insolvency,* NABTALK, Summer 2003, at 23, 24. These measures of insolvency have not found their way into United States bankruptcy statutes.

sheet test, but has substantial cash flow problems.[8] The United States bankruptcy law is designed to provide relief from creditor pressures for debtors with cash flow difficulties, even where they are clearly solvent under a balance sheet test.

As to reorganizations under chapter 11, there is substantial reason for Congress to decide that a debtor should be eligible before the debtor becomes insolvent under a balance sheet test. The prospects for reorganizing a debtor in financial difficulty are much better when the debtor is still solvent than after it becomes insolvent. *See generally* 1 COLLIER ON BANKRUPTCY ¶ 1.19[1] (James William Moore ed., 14th ed.1988) [hereinafter COLLIER] (commenting on the reorganization provisions of the 1898 Act, as amended by the Chandler Act). If a debtor must wait until it becomes insolvent to invoke the reorganization provisions under the bankruptcy law, substantial economic values will often be irretrievably lost. Congress certainly could legitimately decide that it is best for the economy of the United States to permit solvent debtors to reorganize under the bankruptcy law to preserve economic values.

An additional vice of a balance sheet test as a criterion for admission to the bankruptcy system is that substantial time is consumed in determining whether a debtor is in fact insolvent. This case is illustrative—litigation over the debtors' solvency has consumed a large amount of time and effort, and a determination of the debtors' insolvency has not yet been made more than a year after the filing.

If a reorganization is held up pending a determination of balance sheet insolvency, businesses will rarely be reorganized, and at least some of the reorganization value (the value of a business as reorganized as opposed to its liquidation value) will inevitably be lost. Indeed, this is the experience in countries that require insolvency, according to a balance sheet test, as a condition for admission to the bankruptcy system—businesses are generally not reorganizable, and substantial economic values are lost.[9]

Accordingly, the court finds that the balance sheet test is not the appropriate test for insolvency in evaluating Pierce's constitutional challenge in this case. However, assuming that Pierce has implicitly claimed that the liquidity test should also be applied by the court, the court proceeds to consider Pierce's constitutional challenge.

**B. United States and English Bankruptcy Laws**

The United States Congress has enacted five bankruptcy laws.[10] The first was en-

---

**8.** Some bankruptcy courts also frequently see chapter 12 cases where the debtor is quite solvent under a balance sheet test. However, chapter 12 cases are rare in the Central District of California.

**9.** The World Bank recommends against the use of a balance sheet insolvency test as a qualification for bankruptcy. *See* WORLD BANK, PRINCIPLES AND GUIDELINES FOR EFFECTIVE INSOLVENCY AND CREDITOR RIGHTS SYSTEMS ¶ 90 (2001). Instead, if an insolvency test is to be adopted in a country, the World Bank recommends the liquidity test—the debtor's ability to pay debts as they come due. *See id.*

**10.** At the time of the framing of the Constitution, the terms ''bankruptcy'' and ''insolvency'' were applied differently and had operated in different systems. Bankruptcy meant the action against malingering debtors, while insolvency meant relief for the honest but unfortunate debtor. *See Sturges v. Crowninshield,* 4 Wheat. 122, 17 U.S. 122, 194–195, 4 L.Ed. 529 (1819) (''[T]he subject [of bankruptcies] is divisible in its nature into bankrupt and insolvent laws ... [A]lthough the two systems have existed apart from each other, there is such a connection between them, as to render it difficult to say how far they may be blended together''); *see also* CHARLES WARREN, BANK-

acted in 1800 ("the 1800 Act"),[11] and was intended to last only five years. *See generally* Charles Jordan Tabb, *The Historical Evolution of the Bankruptcy Discharge*, 65 Am. Bankr.L.J. 325, 344–45 (1991); Bruce H. Mann, Republic of Debtors (2002) [hereinafter Mann]. This act was repealed in 1803. There was no further federal bankruptcy law until 1841 ("the 1841 Act").[12] *See generally* Tabb, at 349–51. The 1841 Act lasted for an even shorter time than the 1800 Act, and was repealed in 1843. The next bankruptcy law was enacted in 1867 ("the 1867 Act")[13] to deal with economic dislocations resulting from the Civil War. *See generally* Tabb, at 353–55. This law lasted considerably longer than its predecessors, and was repealed in 1878.

Congress enacted permanent federal bankruptcy legislation in 1898 ("the 1898 Act").[14] This law was substantially revised and expanded by the Chandler Act of 1938.[15] It was replaced with the Bankruptcy Code in 1978 (effective October 1, 1979).[16]

English law has included bankruptcy law continuously since 1542, when Parliament enacted the first bankruptcy law.[17] The next major English bankruptcy law was enacted in 1705.[18] In 1732 Parliament enacted a comprehensive codification and revision of English bankruptcy law,[19] which remained in force (with amendments) at the time that the United States Constitution was written.

## C. The Constitutional Convention

Before examining the English and United States statutes, we turn to the constitutional convention in 1789, to see whether there is anything in the records of the convention that might shed light on the role of insolvency in the meaning of "bankruptcies" in the Bankruptcy Clause.

The Bankruptcy Clause received little discussion in the constitutional convention. The bankruptcy issue arose in a discussion of the Full Faith and Credit clause, and drove the constitutional extension of the Full Faith and Credit clause to acts of the legislature as well as judicial decisions. *See* Mann, at 183; *see generally id.* at 182–87. Because credit, like commerce, was not limited by state boundaries, the delegates recognized that a national system of bankruptcy law was needed to support a national credit system upon which commerce depended. *See id.* at 185–87.

The only vote against the Bankruptcy Clause was cast by Roger Sherman of Connecticut. He opposed this provision on the grounds that bankruptcies were punishable by death in some cases in England,

ruptcy in United States History 7 (1935) (at the time of the adoption of the Constitution, only a few states had laws on either the subject of bankruptcies or insolvency, Pennsylvania being the only state that had both—bankruptcy was releasing traders from debts, insolvency a discharge of all persons from prison upon surrendering their property to their creditors).

**11.** Bankruptcy Act of 1800, ch. 19, 2 Stat. 19 (1800) (repealed 1803).

**12.** Bankruptcy Act of 1841, ch. 9, 5 Stat. 440 (1841) (repealed 1843).

**13.** Bankruptcy Act of 1867, ch. 176, 14 Stat. 517 (1867) (repealed 1878).

**14.** Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (1898) (repealed 1978).

**15.** Chandler Act, ch. 575, 52 Stat. 840 (1938) (repealed 1978).

**16.** Pub.L. No. 95–598, 92 Stat. 2549 (1978).

**17.** An act against such persons as do make bankrupts, 34 & 35 Hen. 8, c. 4 (1542).

**18.** 4 Anne, c. 17 (1705).

**19.** 5 Geo. 2, c. 30 (1732).

and he opposed granting Congress this power in the United States. *See Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 472 n. 13, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982) (citing 2 M. FARRAND, RECORDS OF THE CONVENTION OF 1787, at 489 (1911)).

The *Federalist Papers*, which discuss in detail virtually every aspect of the Constitution, make only a single reference to the Bankruptcy Clause. In *Federalist No. 42*, James Madison wrote:

> The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.

THE FEDERALIST No. 42, at 239 (James Madison) (Clinton Rossiter ed., 1961).

A few decades later Justice Story (then a professor at Harvard Law School), in his famous *Commentaries*, stated:

> Perhaps, as satisfactory a description of a bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts.

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1108 n.25. (1833) [hereinafter STORY]. In Justice Story's view, it is the failure to pay debts, not insolvency, that distinguishes a debtor who is an eligible subject for bankruptcy relief.[20]

Thus the constitutional history gives no support to the argument that the founders intended that bankruptcy relief be limited to insolvent debtors, or that this meaning was included in the Bankruptcy Clause.

### D. History of Insolvency Provisions In Bankruptcy Law

Having found the evidence from the constitutional convention unhelpful, we now take a broader look to see what meaning "bankruptcy" was given in relevant legislation on the subject, both before and after the writing of the Constitution. As the Supreme Court has told us, "Probably the most satisfactory approach to the problem of interpretation here involved [the power of Congress under the Bankruptcy Clause] is to examine it in the light of the acts, and the history of the acts, of Congress which have from time to time been passed on the subject...." *Continental Illinois Nat'l Bank & Trust. v. Chicago, Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 670, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

Historically, bankruptcy laws have not been conceived in the United States or England for the protection of debtors, whether honest or dishonest. Bankruptcy laws were enacted principally for the benefit of trade and for the protection of creditors, to give them more powers acting in concert to collect debts than they possessed individually. *See, e.g.,* 2 WILLIAM BLACKSTONE, COMMENTARIES *472 [hereinafter BLACKSTONE]. Indeed, some of the worst abuses were committed by debtors

---

**20.** *See also* STORY, *supra*, § 1101 (''it may be stated, that the general object of all bankrupt and insolvent laws is, on the one hand, to secure to creditors an appropriation of the property of their debtors *pro tanto* to the discharge of their debts, whenever the latter are unable to discharge the whole amount; and, on the other hand, to relieve unfortunate and honest debtors from perpetual bondage to their creditors, either in the shape of unlimited imprisonment to coerce payment of their debts, or of an absolute right to appropriate and monopolize all their future earnings.'')

who refused to pay their debts even though they were solvent and eminently capable of paying. The principal benefit to debtors was the avoidance of debtors' prison or the discharge therefrom. *See id.*

An analysis of the history of bankruptcy laws in the United States, and of their predecessors in England, shows that the Bankruptcy Clause has never been tied to balance sheet insolvency, or insolvency of any other type. No United States bankruptcy act, and none of its English predecessors, has ever required balance sheet insolvency as a condition of either voluntary or involuntary bankruptcy. Of the five United States bankruptcy laws and its three principal English predecessors, only the 1841 and the 1867 Acts required a voluntary debtor to plead that the debtor was insolvent in a liquidity sense, i.e. that the debtor was unable to pay his or her debts as they became due, and such a pleading was unchallengeable.

For involuntary bankruptcy cases, insolvency began to creep into United States bankruptcy law in the 1867 Act as an element in one or more "acts of bankruptcy," any one of which would support an involuntary bankruptcy petition. However, insolvency did not become the chief basis for an involuntary petition until the adoption of the Bankruptcy Code in 1978. Even now, under the Bankruptcy Code, the insolvency test for an involuntary petition is the liquidity test, and not the balance sheet test for insolvency.[21]

### 1. Voluntary Cases

The 1841 Act was the first United States law to authorize a debtor to file a voluntary bankruptcy petition.[22] Neither the 1800 Act nor the English predecessors permitted a voluntary bankruptcy filing. The 1841 Act required that a bankruptcy petition be verified under oath and plead that the debtor is "unable to meet [his or her] debts and engagements . . . ."

This was only a pleading requirement. Neither the parties nor the court had the authority to inquire into whether a debtor was in fact insolvent. *See, e.g., Ex parte Hull,* 12 F.Cas. 853, 856 (S.D.N.Y.1842). Indeed, the court was required to declare a voluntary petitioner bankrupt on the debtor's sworn representation of inability to pay his or her debts, irrespective of the debtor's actual wealth and financial condition. *See id.*

A debtor filing a voluntary bankruptcy petition under the 1867 Act was similarly required to "set forth . . . his inability to pay all his debts in full . . . ." *See id.* § 11. Immediately upon filing a petition stating the debtor's inability to pay his or her debts in full and the debtor's willingness to surrender his or her estate and effects for the benefit of creditors and a desire to obtain the benefits of the bankruptcy law, the debtor was entitled to be adjudicated a bankrupt. *See, e.g., In re Patterson,* 18 F.Cas. 1315, 1317 (S.D.N.Y.1867). No further inquiry as to the debtor's ability to pay was permitted. *See id.* at 1318.

---

**21.** *But see* Thomas E. Plank, *Bankruptcy and Federalism,* 71 Ford. L. Rev. 1063 (2002), where he argues that "bankruptcy" inherently meant insolvency in the eighteenth century. He bases this conclusion principally on the examination of several eighteenth century dictionaries, and ignores the legal history of bankruptcy law. *See id.* at 1076–77. The court finds this approach unpersuasive, in light of the contrary history of bankruptcy law

at that time. Furthermore, even Professor Plank does not contend that bankruptcy meant balance sheet insolvency in 1789.

**22.** However, it appears that debtors frequently arranged with friendly creditors to file essentially voluntary bankruptcy cases under the 1800 bankruptcy law. *See* Mann, *supra,* at 228–39.

The 1898 Act provided that a voluntary debtor could file a bankruptcy case with no requirement of insolvency. *See id.* § 4(a). Unlike the 1841 and 1867 Acts, the 1898 Act did not require a debtor to plead inability to pay his or her debts as they came due. Collier explains § 4(a) as follows:

A voluntary petitioner may be solvent or insolvent, and his motive is generally immaterial except that the petition may not be filed for purposes of perpetrating a fraud. There is nothing in the Act which requires the person to be insolvent, and there seems to be no reason why, if a solvent person cares to have his property distributed among his creditors through bankruptcy proceedings, he should not be allowed to do so . . . . It will not be necessary to allege insolvency in the petition, nor prove it, to procure an adjudication [of bankruptcy].

1 COLLIER ¶ 4.03 (interpreting bankruptcy law as it existed before the Bankruptcy Code took effect in 1979); *see Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 423, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) ("Chapter X proceedings [under the 1898 Act as amended in 1938] are not limited to insolvent corporations but are open to those corporations that are solvent in the bankruptcy (asset-liability) sense but are unable to meet their obligations as they mature") (citing *United States v. Key,* 397 U.S. 322, 329, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970)).

After arising in the 1841 Act as a pleading requirement, insolvency of any kind disappeared entirely in 1878 (the date of repeal of the 1867 Act) as a condition of filing a voluntary bankruptcy petition in the United States.

Thus the statutory history shows that no United States bankruptcy law has ever required a voluntary debtor to show that he or she was in fact insolvent, under a balance sheet test or otherwise, as a pre-requisite of taking advantage of bankruptcy. While two of the nineteenth century acts required a debtor to plead inability to pay his or her debts as they came due, no creditor was permitted to contest this contention.

### 2. Involuntary Cases

Similarly, insolvency has never been required for a debtor to become an involuntary bankrupt, either under United States bankruptcy law or under its English predecessors.

The English bankruptcy laws prior to the United States revolution uniformly provided only for involuntary bankruptcy. Uniformly, also, these laws made no provision for insolvency as a condition of the filing of a petition in bankruptcy against a debtor. Instead, these statutes based the right to file an involuntary bankruptcy petition on what became known as a debtor's "acts of bankruptcy." Any single act of bankruptcy, under each of these laws, was sufficient to support an involuntary bankruptcy petition. The qualifying acts included such conduct as refusing to pay creditors, departing the country, staying in one's house (to avoid service of process), taking sanctuary, and permitting himself or herself to be arrested (presumably for not paying debts). In addition, the creditor was required to show that the debtor took such an action with the intent to hinder or delay his or her creditors.

Blackstone's COMMENTARIES ON THE LAWS OF ENGLAND, published in 1765 to 1769, are in accord with the English laws. Blackstone wrote extensively in his COMMENTARIES about bankruptcy law. However, like the English bankruptcy law of his time, Blackstone makes no reference to insolvency as a qualification for bankruptcy. *See* 2 BLACKSTONE, *supra,* at *471–88.

Blackstone's COMMENTARIES were well known to the writers of the Constitution

and to early United States judges and lawyers. *See Hanover Nat. Bank v. Moyses*, 186 U.S. 181, 187, 22 S.Ct. 857, 46 L.Ed. 1113 (1902); *Nelson v. Carland*, 42 U.S. (1 How.) 265, 270–73, 11 L.Ed. 126 (1843) (dissenting opinion of Justice Catron).

In the United States, the first two bankruptcy acts, the 1800 Act and 1841 Act permitted a creditor to file an involuntary bankruptcy petition against a debtor only if the debtor had committed an act of bankruptcy. The 1800 Act specified ten qualifying acts of bankruptcy, which largely mirrored those in the English statutes. *See* 1800 Act, § 1. The 1841 Act reduced to five the qualifying acts of bankruptcy. *See* 1841 Act, § 1. Like their predecessor English laws, none of the qualifying acts of bankruptcy in either the 1800 or the 1841 Acts included insolvency as an element or factor to be considered in making an adjudication of bankruptcy.

The 1867 Act was the first to introduce insolvency as an element in any of the acts of bankruptcy. Of the nine statutory acts of bankruptcy [23] that could support an involuntary petition under the 1867 Act, one was the granting of a preferential transfer, "being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency . . . . ." *See* 1867 Act, § 39. None of the other acts of bankruptcy in the 1867 Act involved the insolvency of the debtor.

In the 1898 Act insolvency began to take a prominent role in the acts of bankruptcy that could support an involuntary petition. The original version of the 1898 Act decreased to five the number of bankruptcy acts, three of which involved insolvency.

*See* 1898 Act, § 3(a). One act of bankruptcy under this law was the preferential transfer, brought forward from the 1867 Act, which continued to require that the debtor be insolvent. *See id.* § 3(a)(2). Another act of bankruptcy supporting an involuntary petition occurred when the debtor, while insolvent, suffered or permitted a creditor to obtain a preference through legal proceedings, and who further failed to discharge the preference at least five days before a sale or final disposition of any property affected by the preference. *See id.* § 3(a)(3). In addition, it was an act of bankruptcy to admit in writing the inability to pay debts and being willing to be adjudged a bankrupt. *See id.* § 3(a)(5). Furthermore, with respect to a fraudulent transfer, the debtor was given an affirmative defense of solvency. *See id.* § 3(c); *see generally* 1 COLLIER ¶ 1.19[1].

Congress amended the fourth act of bankruptcy (making an assignment for the benefit of creditors) in 1903 to include having a receiver or trustee take charge of the debtor's property while the debtor was insolvent. *See* Act of February 5, 1903, 32 Stat. 797; *see also In re Valentine Bohl Co.*, 224 F. 685 (2d Cir.1915) (dismissing involuntary petition on three grounds: the debtor was balance sheet solvent when the state court receiver was appointed, it was impossible to determine whether the district court receivership was ordered "because of [balance sheet] insolvency" (as the clause required for an involuntary receivership), and there was no evidence of a fraudulent transfer). In 1926, Congress added yet a fifth act of bankruptcy involving the debtor's insolvency to the 1898 Act: suffering, while insolvent, a lien that was not vacated or discharged within thirty

---

**23.** Case law under the 1867 Act treated a general assignment for the benefit of creditors as a tenth act of bankruptcy. *See Boese v.*

*King,* 108 U.S. 379, 385, 2 S.Ct. 765, 27 L.Ed. 760 (1883). This act of bankruptcy also did not require the debtor's insolvency.

days thereafter. *See* Act of May 27, 1926, 44 Stat. 662.

In the 1898 Act (but not previously), "insolvency" was defined. This definition adopted the modified balance sheet test that now appears in § 101(32)(A). *See* 1898 Act § 1(19); *see also American Nat'l Bank & Trust Co. v. Bone,* 333 F.2d 984, 986–87 (8th Cir.1964) (utilizing a balance sheet to show insolvency); *Syracuse Engineering Co. v. Haight,* 110 F.2d 468, 471 (2d Cir.1940). This definition was a change from the previous understanding of solvency for the purposes of bankruptcy law. While the previous statutes contained no definition of solvency, it was generally understood that the liquidity test applied in the bankruptcy context. *See generally* 1 COLLIER ¶ 1.19[1].

The Chandler Act in 1938, which substantially amended the 1898 Act, expanded the scope of the 1903 addition by applying it both when the debtor was insolvent (on a modified balance sheet basis) and when the debtor was unable to pay his or her debts as they matured (the liquidity definition). The Chandler Act also revised the various reorganization provisions added to the 1898 Act beginning in 1933. For these provisions (the predecessors of chapter 11), the liquidity definition of insolvency was ordinarily invoked.

Throughout the career of the 1898 Act (which was repealed effective September 30, 1979), making a general assignment for the benefit of creditors was an act of bankruptcy that did not require the insolvency of the debtor. *See id.* § 3(a)(4).

The Bankruptcy Code, while reducing to two the acts of bankruptcy that can support an involuntary petition, continues to permit an involuntary bankruptcy notwith-standing a debtor's solvency. The Code permits a court to order relief against the debtor if, within 120 days of the filing of the petition, a custodian, receiver or agent is appointed or takes possession of less than substantially all of the debtor's property to enforce a lien. *See* § 303(h)(2).

However, virtually every involuntary petition filed under the Bankruptcy Code relies on § 303(h)(1),[24] which authorizes an involuntary case where the debtor "is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute . . . ." Thus insolvency is now a major factor in an involuntary bankruptcy case. But it is the liquidity definition of insolvency that controls, and not the balance sheet definition on which Pierce relies.

The court concludes from the foregoing history that, at the time that the Constitution was written, insolvency of any kind was utterly unknown as a requirement for filing a bankruptcy case. Thus it is not credible that the framers of the Constitution thought that a requirement of insolvency was included in the concept of bankruptcy that found its way into the Bankruptcy Clause. Furthermore, insolvency has never been a statutory requirement for either voluntary or involuntary bankruptcy under United States bankruptcy law. Finally, balance sheet insolvency was altogether unknown for bankruptcy purposes in the United States until 1898.

### E. Watershed Developments in Bankruptcy Concepts

The development of bankruptcy law did not end with the writing of the Bankruptcy Clause in the United States Constitution in

---

**24.** As a bankruptcy judge for nearly twenty years, I have handled nearly a hundred thousand bankruptcy cases. Perhaps two hundred of these cases have commenced with involuntary bankruptcy petitions. I can recall only one that probably was based on § 303(h)(2).

1787. There are three watershed developments in United States bankruptcy law since that date.

The first major development, which was introduced in the 1841 Act, was the authorization for a debtor to file a voluntary bankruptcy case without waiting for a creditor to file an involuntary petition against the debtor. Justice Catron, sitting on circuit in the district of Missouri, found this provision constitutional in *In re Klein,* 42 U.S. 277, 1 How. 277, 11 L.Ed. 275, 14 F.Cas. 716, 718 (1843), reported in a note to *Nelson v. Carland,* 42 U.S. (1 How.) 265, 277, 11 L.Ed. 126 (1843). The Supreme Court cited *Klein* with approval on this issue in *Hanover Nat'l Bank v. Moyses,* 186 U.S. 181, 186, 22 S.Ct. 857, 46 L.Ed. 1113 (1902).

The second landmark major development, also adopted in the 1841 Act, was the extension of the bankruptcy law to individuals who are not traders. The Supreme Court approved this development also in *Moyses,* 186 U.S. at 186, 22 S.Ct. 857, again relying on *Klein.*

The third major landmark development was the addition of reorganization as a mode of bankruptcy authorized under the Bankruptcy Clause. This first reorganization provision appeared in United States law in the Act of March 3, 1933, which was signed by President Hoover on his last day in office.[25] The Supreme Court validated the constitutionality of reorganization under the Bankruptcy Clause in *Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P. Ry.,* 294 U.S. 648, 668, 55 S.Ct. 595, 79 L.Ed. 1110 (1935) (railroad reorganization under § 77 of the 1898 Act as amended in 1933); *accord, United States v. Bekins (In re Lindsay–Strathmore Irrigation Dist.),* 304 U.S. 27, 47, 58 S.Ct. 811, 82 L.Ed. 1137 (1938).

Each of these provisions constituted a landmark change in bankruptcy law from that known in 1787 when the Bankruptcy Clause was written into the Constitution. In the words of the Supreme Court itself, these extensions of bankruptcy law were of a "fundamental and radically progressive nature." *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 588, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (quoting *Continental Illinois,* 294 U.S. at 671, 55 S.Ct. 595). Nonetheless, the Supreme Court found that each of these developments comes within the ambit of the Bankruptcy Power, and thus is constitutional. *Radford,* 295 U.S. at 587–88, 55 S.Ct. 854; *Continental Illinois,* 294 U.S. at 671, 55 S.Ct. 595.

More generally, the Supreme Court has very recently stated that the Constitution should not be restricted to a particular generation's interpretation of the Constitution: "As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Lawrence v. Texas,* —— U.S. ——, 123 S.Ct. 2472, 2484, 156 L.Ed.2d 508 (2003) (finding due process violation in Texas statute prohibiting same-sex sodomy).

In contrast to these landmark bankruptcy law changes, the filing of a bankruptcy case by or with respect to a solvent debtor has always been permitted under bankruptcy law, both under every bankruptcy law enacted in the United States and under every prior law enacted in England.

### F.  Supreme Court Case Law

Supreme Court case law likewise gives no support to the thesis that, as a constitutional matter, congressional power to provide bankruptcy protection must be limited

---

**25.** The various reorganization provisions enacted over several years beginning in 1933 were substantially revised in the Chandler Act of 1938.

to those who are insolvent, whether under a balance sheet test or otherwise.[26] Even if the English bankruptcy law in effect in 1787 had limited bankruptcy to debtors who satisfied an insolvency test, this would not be determinative in this case more than two centuries later.

### 1. Expansive Supreme Court Statements

The United States Supreme Court has consistently taken an expansive view of the Bankruptcy Powers, to permit their application in the context of the enormous expansion of the economy since 1787 and the correspondingly great elaboration of the legal structures supporting it:

> [T]he notion that the framers of the Constitution, by the bankruptcy clause, intended to limit the power of Congress to the then existing English law and practice upon the subject long since has been dispelled.... Whether a clause in the Constitution is to be restricted by the rules of the English law as they existed when the Constitution was adopted depends upon the terms or the nature of the particular clause in question.

*Continental Illinois,* at 668, 55 S.Ct. 595. The Supreme Court has repeatedly and consistently held that the Bankruptcy Powers are not limited to the meaning of the term "bankruptcy" at the time of the formulation of the Constitution. *See, e.g., Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938); *Adair v. Bank of America NTSA,* 303 U.S. 350, 354, 58 S.Ct. 594, 82 L.Ed. 889 (1938); *Hanover National Bank,* at 187, 22 S.Ct. 857 ("The framers of the Constitution were familiar with Blackstone's Commentaries, and with the bankrupt laws of England, yet they granted plenary power to Congress over the whole subject of 'bankruptcies,' and did not limit it by the language [that they] used.")

The core of the federal bankruptcy power, according to the Supreme Court, is "the restructuring of debtor-creditor relations ...." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion). Beyond this core, as a general rule, the Supreme Court has said, "the subject of bankruptcies is incapable of final definition." *Gibbons,* 455 U.S. at 466, 102 S.Ct. 1169; *accord Wright v. Union Central,* 304 U.S. at 513, 58 S.Ct. 1025; *Continental Illinois,* 294 U.S. at 669–70, 55 S.Ct. 595 ("[t]hose limitations have never been explicitly defined, and any attempt to do so now would result in little more than a paraphrase of the language of the Constitution without advancing far toward its full meaning."). In *Gibbons* the Supreme Court stated:

> [W]e have previously defined "bankruptcy" as the subject of the relations between an *insolvent or nonpaying or fraudulent debtor* and his creditors, extending to his and their relief. Congress' power under the Bankruptcy Clause contemplates an adjustment of a failing debtor's obligations. This power extends to all cases where the law causes to be distributed, the property of the debtor among his creditors. It includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligation of contracts, and this the States were forbidden to do.

*Gibbons,* 455 U.S. at 466, 102 S.Ct. 1169 (emphasis added, quotations and citations omitted).

---

**26.** The court has found no relevant case law from the Ninth Circuit or the Ninth Circuit Bankruptcy Appellate Panel.

In *Moyses,* the Court added that the debtor "may be, in fact, fraudulent, and able and unwilling to pay his debts; but the law takes him at his word, and makes effectual provision, not only by civil, but even by criminal, process, to effectuate his alleged intent of giving up all his property." *Id.* at 861. Thus the "subject of bankruptcies" includes the power to discharge a debtor from contracts and legal liabilities, and to distribute the debtor's property to creditors. *Id.* at 188, 22 S.Ct. 857 (upholding the constitutionality of the Bankruptcy Act of 1898 insofar as it authorized the discharge of a judgment on a promissory note). The Court in *Moyses* also stated: "all intermediate legislation, affecting substance and form, but tending to further the great end of the subject,—distribution and discharge,—are in the competency and discretion of Congress." *Id.* at 186, 22 S.Ct. 857 (quoting *In re Klein,* 14 F.Cas. No. 716 (D.Mo.1843), *reprinted in* a note to *Nelson v. Carland,* 42 U.S. (1 How.) 265, 277, 11 L.Ed. 126, 130 (1843)).

The Court further stated in *Continental Illinois* that bankruptcy "may be construed to include a debtor who, although unable to pay promptly, may be able to pay if time to do so be sufficiently extended," i.e., a solvent debtor. *Id.* at 668, 55 S.Ct. 595. There is no reason to believe that the bankruptcy laws of the nineteenth century exhausted congressional power under the Bankruptcy Clause. *See id.*

The Supreme Court has also spoken on the essential purposes of chapter 11, under which the debtors filed this case. In *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Court stated that the policy of chapter 11 is to permit the successful rehabilitation of debtors. The Court elaborated this policy in *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145

(1991), to state that one Congressional purpose of chapter 11 is "permitting business debtors to reorganize and restructure their debts in order to revive the debtors' businesses and thereby preserve jobs and protect investors." *Id.* at 163, 111 S.Ct. 2197. In addition, the Court said in that case:

> Chapter 11 also embodies the general Code policy of maximizing the value of the bankruptcy estate. Under certain circumstances a consumer debtor's estate will be worth more if reorganized under Chapter 11 than if liquidated under Chapter 7. Allowing such a debtor to proceed under Chapter 11 serves the congressional purpose of deriving as much value as possible from the debtor's estate.

*Id.* The Court used this rationale in *Toibb* to hold that individual consumers, like the debtors in this case, are entitled to take advantage of chapter 11 to reorganize their financial affairs, even though they may have no business to reorganize. *See id.* at 160–66, 111 S.Ct. 2197.

Similarly, in *Bank of America NTSA v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), the Court stated that, "the two recognized policies underlying Chapter 11[are] preserving going concerns and maximizing property available to satisfy creditors . . . ." *Id.* at 453, 119 S.Ct. 1411.

The debtors in this case at least qualify as "nonpaying" debtors, in the terminology of *Gibbons,* and they certainly appeared to be failing when they filed their case. If they enjoy a bonanza from their chapter 11 plan, it will result from Pierce's refusal to file a claim on his $12 million Texas judgment.

Furthermore, the court finds that the chapter 11 plan in this case maximizes the property available to satisfy creditors. At the time of filing, it was not at all clear

that the debtors could pay their creditors in full. The plan settles this issue.

## 2. Cases Finding Bankruptcy Provisions Unconstitutional

There are very few Supreme Court cases holding that Congress has exceeded its constitutional powers in legislating on the subject of bankruptcy. In light of the foregoing expansive descriptions of Congress' powers under the Bankruptcy Clause, these cases shed little light on any relevant limitations on Congress' Bankruptcy Powers.

Perhaps the best known case holding unconstitutional a provision of bankruptcy law is *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), which invalidated the Frazier–Lemke addition to the 1898 Act that permitted a farmer to pay rent instead of mortgage payments for five years and then retire the mortgage by paying only the (likely reduced) fair market value of the property. The principal vice of this provision, the Supreme Court found, was that Congress applied it only to mortgages existing on the date of enactment, and thus it constituted a taking of existing property rights of mortgage holders in violation of the Just Compensation clause of the Fifth Amendment.[27] *See id.* at 589–602, 55 S.Ct. 854.

In *Railway Labor Executives' Ass'n v. Gibbons,* 455 U.S. 457, 469–73, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982), the Supreme Court held that bankruptcy legislation explicitly applying to a single (albeit large) debtor, and no other similarly situated debtors, unconstitutionally violated the uniformity requirement of the Bankruptcy Clause. A bankruptcy law, the Supreme Court held, must at least apply uniformly to a defined class of debtors. *See id.* at 473, 102 S.Ct. 1169. *But see Regional Rail Reorganization Cases,* 419 U.S. 102, 158–60, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (holding that bankruptcy statute governing railroad reorganization in one region did not violate Uniformity Clause when no railroad reorganization was pending outside that region). Similarly, the Ninth Circuit has held that § 317(a) of the Judicial Improvements Act of 1990, which authorizes bankruptcy administrators (employed by the judicial branch) to substitute for United States Trustees (employed in the Department of Justice) in two states alone (North Carolina and Alabama) violates the Uniformity Clause. *See St. Angelo v. Victoria Farms, Inc.,* 38 F.3d 1525, 1531–32 (9th Cir.1994).

In *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the Supreme Court held that the bankruptcy power did not permit Congress to eliminate a party's Seventh Amendment jury trial right by relabeling the cause of action and assigning it to a specialized court in equity. *Id.* at 61, 109 S.Ct. 2782. Also well known is *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858 (1982), where the Supreme Court found in 1982 that the

---

**27.** *See also United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), where the Supreme Court construed narrowly the provision in § 522(f) that permits a debtor to avoid the fixing of a lien on an interest of the debtor in property, to the extent that the lien impairs an exemption. The Court held that, to avoid a likely violation of the Just Compensation Clause of the Fifth Amendment, this provision must not permit the avoidance of liens existing before its enactment. *See id.* at 82, 103 S.Ct. 407. *But see Webber v. Credithrift (In re Webber),* 674 F.2d 796 (9th Cir.1982), in which the Ninth Circuit held that a debtor may take advantage of § 522(f) to avoid the fixing of a lien on an interest in property that impaired an exemption, where the lien had been fixed before the effective date of the Bankruptcy Code (and § 522(f)) but after the enactment of the Code. *See id.* at 803–04.

Bankruptcy Clause did not authorize Congress to grant bankruptcy jurisdiction to judges lacking Article III tenure.

There are also very few lower court decisions finding a bankruptcy law provision unconstitutional. There is one contemporary example. A battle rages among lower courts today on whether rights clearly legislated under the Bankruptcy Clause can be enforced under § 106(a) in federal court against state governments in light of the Eleventh Amendment (constitutionalizing state sovereign immunity) and case law thereunder. In *Hood v. Tennessee Student Assistance Corp. (In re Hood),* 319 F.3d 755, 761–68 (6th Cir.), *cert. granted,* —— U.S. ——, 124 S.Ct. 45, 156 L.Ed.2d 703 (2003), the Sixth Circuit held that the Bankruptcy Clause authorized Congress, notwithstanding the Eleventh Amendment, to abrogate state sovereign immunity in bankruptcy matters. In contrast, the following circuit court decisions have held that the Eleventh Amendment prevents Congress from abrogating state sovereign immunity in bankruptcy matters: *Nelson v. La Crosse County Dist. Attorney* (*In re Nelson*), 301 F.3d 820, 832 (7th Cir.2002); *Mitchell v. Franchise Tax Bd.* (*In re Mitchell*), 209 F.3d 1111, 1121 (9th Cir.2000); *Sacred Heart Hosp. v. Pennsylvania* (*In re Sacred Heart Hosp.*), 133 F.3d 237, 243 (3d Cir.1998); *Department of Transportation and Development v. PNL Asset Mgmt. Co. LLC* (*In re Fernandez*), 123 F.3d 241, 243 (5th Cir.), *amended by* 130 F.3d 1138, 1139 (5th Cir.1997); *Schlossberg v. Maryland (In re Creative Goldsmiths),* 119 F.3d 1140, 1145–46 (4th Cir.1997).

This case today does not require the court to determine the limits of the Bankruptcy Powers granted to the federal government in the Constitution. Accordingly, the court leaves this issue to another day.

## G.  Substantive Due Process

Pierce contends that Howard's bankruptcy case deprives him of his substantive due process rights, thereby invoking "dormant" substantive economic due process rights that have disappeared from Supreme Court jurisprudence since the 1930's. The Fifth Amendment provides, in relevant part, "nor shall any person . . . be deprived of life, liberty or property, without due process of law . . . ." Under this theory, the Fifth Amendment is a limitation on the scope of "the subject of bankruptcies."

Recent Supreme Court decisions make it clear that substantive due process is alive and well in its jurisprudence, insofar as it concerns individual rights and liberties. *See, e.g., Lawrence v. Texas,* —— U.S. ——, 123 S.Ct. 2472, 2484, 156 L.Ed.2d 508 (2003) (finding due process violation in Texas statute prohibiting same-sex sodomy). In contrast, substantive economic due process remains sound asleep in Supreme Court jurisprudence. Thus, entirely apart from the particular controversy before this court, Pierce faces a steep uphill climb to invoke substantive economic due process.

Apparently the only Supreme Court case addressing substantive due process rights in the bankruptcy context is *Canada Southern Ry. v. Gebhard,* 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883), where New York bondholders challenged a Canadian railroad "scheme of arrangement" specially authorized by Canadian statute. The bondholders had not participated in the Canadian proceeding. The Court found that the scheme was "no more than is done in bankruptcy" in the United States, and thus that the scheme should be enforced in a United States court against all creditors. *See id.* at 537–40, 3 S.Ct. 363. The Supreme Court rejected the

substantive due process challenge to the arrangement. *See id.* at 537, 3 S.Ct. 363.

Procedural due process rights under the Fifth Amendment clearly apply in the bankruptcy context. In *Hanover Nat. Bank v. Moyses,* 186 U.S. 181, 187, 22 S.Ct. 857, 46 L.Ed. 1113 (1902), for example, the Supreme Court found that the notice requirements of the Fifth Amendment Due Process Clause applied and were satisfied. The Court rejected the contention that personal notice of the filing was required. The Court found that bankruptcy proceedings are, generally speaking, in the nature of proceedings *In rem,* for which notice by publication and mail satisfy due process requirements. Pierce does not complain of procedural due process violations in this case.

**[4]** The court finds it unnecessary to explore in detail the constitutional consequences of bankruptcy legislation that falls outside the Bankruptcy Powers of the Constitution. If this case were to fall outside the scope of the Bankruptcy Clause, the court assumes without deciding that the law would violate some constitutional provision. However, the court does not reach this issue because the court finds that Congress has the power under the Bankruptcy Clause to determine that a debtor may invoke rights under the Bankruptcy Code to adjust obligations with creditors before the debtor becomes insolvent under a balance sheet test.

The larger constitutional issue concerns the power to extinguish debts and cancel contractual obligations. Under the Articles of Confederation, the states possessed and used this power, to the consternation of many. *See* Alexander Hamilton, THE FEDERALIST NO. 85, praising the new constitution's "precautions against the repetition of those practices on the part of the State governments which have undermined the foundations of property and credit,

have planted mutual distrust in the breasts of all classes of citizens, and have occasioned an almost universal prostration of morals." The states, because they were sovereign, possessed broad power to discharge debts and contractual obligations.

What has happened to this power? The grand bargain of 1787 was that states surrendered it to the new federal government in exchange for the checks and balances of a federal system that would restrain the new national legislature from unwise debt forgiveness. *Moyses,* 186 U.S. at 187, 22 S.Ct. 857. Thus, the grant of power to Congress over the "subject of bankruptcies" in Article I, Section 8 is balanced with the prohibition in Article I, Section 10, forbidding states from impairing the obligation of contracts. The power to discharge debts and contractual obligations was not extinguished: it was surrendered to the federal government. *See id.*

**[5–7]** There is a significant difference, with respect to the Bankruptcy Power, between property interests and contract rights. *See Webber v. Credithrift (In re Webber),* 674 F.2d 796, 802 (9th Cir.1982). In the bankruptcy context, property rights enjoy at least a measure of protection under the Due Process and Just Compensation Clauses of the Fifth Amendment. *See, e.g., Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (just compensation); *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) (same). On the other hand, Congress is not prohibited from passing laws that impair the obligation of contracts. *See, e.g., Continental Bank v. Rock Island Ry.,* 294 U.S. 648, 680, 55 S.Ct. 595, 79 L.Ed. 1110 (1935); *Webber,* 674 F.2d at 802. "In fact, the very essence of bankruptcy laws is the modification or impairment of contractual obligations." *Webber,* 674 F.2d at 802.

**[8]** The protection of property rights in the bankruptcy context, however, is measured. The Supreme Court made this clear in *Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938):

> Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided the limitations of the due process clause are observed.

*Id.* at 518, 58 S.Ct. 1025.

**[9]** In this case, Pierce has neither property rights nor contract rights to assert against the debtors. He does not even have a claim against the debtors in this case, because he refused to file his claim. He has only a Texas state court judgment that is on appeal. This claim is in danger of discharge if the debtors' chapter 11 plan is confirmed. The court finds that this is an insufficient basis to find a violation of Pierce's Fifth Amendment economic substantive due process rights in this case.

### IV. Conclusion

The court concludes that Pierce's constitutional challenge to the debtors' bankruptcy case and their plan of reorganization under chapter 11 cannot be sustained. The court finds that the balance sheet test for insolvency was unknown in United States bankruptcy law until 1898, when balance sheet insolvency first entered United States bankruptcy law. Prior thereto, insolvency in the bankruptcy context always meant liquidity (or equity) insolvency.

**[10]** The court finds that Congress validly exercised the Bankruptcy Powers under the Constitution to authorize a debtor who is solvent, whether in the balance sheet sense or in the liquidity sense, to file a chapter 11 case and to confirm a plan of reorganization.

The court has previously found against Pierce on his statutory objections to the chapter 11 plan and on his motion to dismiss based on bad faith. Accordingly, the court finds that the chapter 11 plan should be confirmed and the motion to dismiss should be denied.

### NOTICE OF FILING SECOND AMENDED OPINION

Pursuant to *Dressler v. Seeley Co. (In re Silberkraus),* 336 F.3d 864, 869 (9th Cir. 2003), the court HEREBY GIVES NOTICE of the filing of its Second Amended Opinion on Plan Confirmation And Motion To Dismiss (Constitutional Issues) in the above case, a copy of which is attached.



**In re Viola Carolyn LUCAS, also known as Carolyn Lucas, Debtor.**

**Orvey R. Cousatte, Administrator of the Estate of Imogene Collier, Plaintiff–Appellant,**

**v.**

**Viola Carolyn Lucas, Defendant– Appellee.**

**BAP No. KS–02–088.**
**Bankruptcy No. 01–12092–7.**
**Adversary No. 01–5116.**

United States Bankruptcy Appellate Panel for the Tenth Circuit.

Oct. 20, 2003.

Judgment creditor brought adversary proceeding against Chapter 7 debtor, seek-